RAYMOND J. H. KOBERG AND ANOTHER v. BEN J. JONES, ADMINISTRATOR c.t.a. OF ESTATE OF H. E. GLAESER.

157 N. W. (2d) 47.

March 8, 1968—No. 40,703.

*Blethen, Ogle, Gage & Krause, Arthur H. Ogle,* and *Leslie H. Morse,* for appellant.

*McLean, Peterson, Sullivan & Etzel* and *Thomas R. Sullivan,* for respondents.

MURPHY, JUSTICE.

This is an appeal from an order of the district court denying a motion for a new trial. The issue presented is whether a fiduciary relationship between the parties entitles respondents to set off against their indebtedness to an insolvent decedent's estate the amount of decedent's indebtedness to a third party which was assigned to respondents after death.

Appellant, Ben J. Jones, is the representative of the estate of H. E. Glaeser who, for many years prior to his death on May 29, 1962, was president and principal managing officer of the First National Bank of Good Thunder, Minnesota. Respondents, Raymond J. H. Koberg and Irene H. Koberg, his wife, owned and operated a farm near Good Thunder. For many years the Kobergs did their banking at the First National Bank and sought Glaeser's business advice. During much of the same time one Otto Bergemann, a brother of Mrs. Koberg, also did his banking with the Good Thunder Bank and dealt with Glaeser both individually and in his capacity as an officer of the bank. It appears that Bergemann had confidence in the judgment of Glaeser since the record indicates that at one time he gave him a power of attorney.

For the same period of time, in addition to his work as president of the bank, Glaeser carried on a private lending business of his own, personally borrowing money from individuals and lending it to persons who normally would be poor risks for the bank. He cleared most of these transactions through a so-called "management account" which he maintained in the bank or, as in the Bergemann case, through his own personal account, keeping a personal record of the transactions separate and apart from the bank records. Glaeser's method of operation was described by a knowledgeable witness as follows:

"Now, in this particular instance, Mr. Glaeser borrowed money from [about 10] creditors who have claims in here and put it into this

deposit account known as the management account which was a checking account.

\* \* \* \* \*

"At one time the First National Bank had a $6,000 limit and during this time any one individual's line could only go to $6,000.

"Now, there were various borrowers that crowded that and Mr. Glaeser, in my opinion, started a separate little bank, so to speak, in this management account. He supplied the money for that by borrowing it from other people and paying them four, five, or six per cent interest, whichever he could get for it and it went into this management account. When a loan or a borrower became heavy, he would take out of that account—he would write a check on that account and buy the note from the bank and carry it as an asset of this checking account."

While this procedure does not appear to be an approved practice, it is not seriously suggested that it has affected the legality of the undertakings with which we are here concerned. The bank records show that, on August 21, 1953, Bergemann withdrew $6,000 from his savings account in the bank which, apparently, was loaned to Glaeser. A note from Glaeser to Bergemann in the amount of $6,000, dated August 21, 1957, appears to be a renewal of that obligation. Bergemann loaned this money to Glaeser in order to get a higher interest rate than he could secure on his savings account in the bank.

Among the persons to whom Glaeser advanced money as part of his private operations were the Kobergs. It appears that the Kobergs' credit needs were in excess of the legal lending limit of the bank and that they had trouble meeting their obligations. On February 26, 1960, the Kobergs executed a promissory note to Glaeser in the amount of $5,400 secured by a second mortgage on their farm. While it was Glaeser's custom to use bank forms in these personal dealings, it is conceded that Koberg knew that he was dealing with Glaeser personally and not with the bank. The following is from his testimony:

"Q. Did you know, Mr. Koberg, that when this note was assigned to Glaeser by the First National Bank that your line of

credit with the First National Bank was in excess of their legal limit and that the bank examiners would object to that line of credit if it wasn't taken out of the bank by Mr. Glaeser, did you know that?

"A.  Yes, I did.

"Q.  Mr. Glaeser told you that, didn't he?

"A.  Yes, he did."

On redirect examination, there is the following testimony:

"Q.  * * * In your dealings with Mr. Glaeser at that time [when the note and mortgage were executed in 1960], was it your understanding that you were dealing with Mr. Glaeser personally or the bank?

"A.  It was personally understood that I was dealing with Mr. Glaeser, that's right."

At another point, he testified:

"It was understood that way that Mr. Glaeser was giving me a personal note. I didn't understand that it was going through the bank."

He again said:

"Yes, as I stated to Mr. Morse that my bank account was such that it was in danger and so Mr. Glaeser—on the bank examiners— so Mr. Glaeser gave me a personal note."

The record is clear that the Koberg note and mortgage were not carried as an asset on the books of the bank nor is it suggested that the bank makes a claim to it.

Following Glaeser's death in May 1962, Bergemann filed a formal claim against the estate based upon Glaeser's indebtedness to him, as represented by the $6,000 note. It appears that the estate is insolvent and claims have not yet been paid. About a year after Bergemann filed his claim, on September 6, 1963, he purported to assign the note to the Kobergs. Thereafter, the Kobergs commenced this action against the representative of the estate, claiming the note from Glaeser to Bergemann as a setoff against their indebtedness to Glaeser on the note given by them.

There was considerable testimony as to the nature of the relationship between the bank, Glaeser, Bergemann, and the Kobergs and about the details of the financial dealings between them. As bearing upon their relationship, the record would indicate that Bergemann is a half brother of Mrs. Koberg, a 71-year-old man of limited education who has worked all his life as a farmhand. For 7 or 8 years preceding the trial, he had lived on the Koberg farm as a member of their family. Both Koberg and Bergemann had done business at the Good Thunder Bank for many years. It also appears from the record that by a long series of notes and renewals extending back to 1953 or earlier the bank had held notes evidencing Koberg's indebtedness and that when Koberg's credit deteriorated Glaeser provided financial assistance to him through the use of the so-called "management account."

After Glaeser's death in 1962, the Kobergs were pressed by the estate to pay off the 1960 note. It was then that the Kobergs and Bergemann determined that they would attempt to salvage from the insolvent estate the $6,000 obligation of Glaeser to Bergemann by having Bergemann assign it to them so that they could set it off against their debt to the estate. The Kobergs accordingly brought this action to restrain the representative of the estate from foreclosing the second mortgage and for an order requiring that the note assigned to them by Bergemann be set off against the Kobergs' indebtedness to Glaeser's estate. The trial court made findings and an order granting the setoff in favor of the Kobergs against the Glaeser estate and holding that the estate was indebted to the Kobergs in the sum of $471.28, the difference between the Bergemann note and accrued interest, totaling $6,843.28, and the amount of the Koberg note and accrued interest, totaling $6,372.

The basis for the trial court's determination was that Glaeser breached a fiduciary relationship existing between the Kobergs and himself and one existing between Bergemann and Glaeser. We gather from the trial court's findings that the parties were misled and deceived by Glaeser's conduct. The findings stress that Glaeser borrowed from Bergemann at 4 percent interest and loaned to the

Kobergs at 7 percent, and that it was Glaeser's plan to repay the $6,000 note with proceeds from the collection of the Koberg note and mortgage. The court found:

"* * * That except for the confidential relationship which the said H. E. Glaeser deliberately developed and established with the plaintiffs and the said Otto Bergemann so as to effect a scheme whereby the said H. E. Glaeser could realize a personal profit from the financial transactions carried on with plaintiffs and Otto Bergemann through the First National Bank of Good Thunder, [he] would not have been in a position to extract a loan from the said Otto Bergemann or a real estate mortgage from the plaintiffs. That the plaintiffs would otherwise have been able to obtain a loan directly from the said Otto Bergemann with interest at the rate of 4% per annum."

We have carefully examined the record and can find nothing in it which would support the conclusion that Glaeser contrived to prevent the Kobergs from borrowing money directly from Otto Bergemann. There is nothing in the record to indicate that Bergemann was ever presented with the choice as to whether he should loan the money to Glaeser or to the Kobergs. Nor is there anything in the record to indicate that the Kobergs ever broached the subject of a loan to Bergemann. If, in the family relationship, there may have been some discussion of Kobergs' need for financing, the inference is that Bergemann would have preferred to have them deal with the bank. The record would indicate that there was either a lack of communication or a lack of mutual confidence between Bergemann and his relatives which stood in the way of a possible loan transaction between them. It can hardly be argued that the Kobergs themselves were defrauded. There is nothing in the record to indicate that Glaeser prevented Bergemann from loaning money to them. Koberg admitted that he never asked Bergemann for a loan although the Kobergs knew that he had money in the bank, and there is no evidence that Bergemann ever offered them one. Bergemann was aware that the Kobergs were heavily indebted on their farm.

While the trial court has made a gratuitous finding that the money

borrowed from Glaeser by the Kobergs was the same money that Bergemann had loaned to Glaeser, there is no support for this finding in the evidence. First of all, there is no similarity in the dates. The initial withdrawal of $6,000 was on August 21, 1953. If a note were given at that time, it was undoubtedly destroyed and replaced by the note given exactly four years later on August 21, 1957. There is no transaction with the Kobergs on either of those dates. The records of the "management account" confirm the records of the bank that a balance owed it by the Kobergs of $4,957.21, which thereafter grew to $5,400, was taken over by Mr. Glaeser on December 7, 1955, two years after the initial withdrawal and two years prior to the loan involved in this lawsuit. None of the dates coincide—nor do the amounts. The record would indicate that the $6,000 borrowed from Otto Bergemann was actually loaned by Glaeser to a half a dozen or more different people. There is no evidence in the record to indicate identical or even similar amounts in these various transactions.

■ In the final analysis, the record in this case establishes that the Glaeser estate has an asset of $5,400, represented by the note and second mortgage given by the Kobergs. The estate has a liability of $6,000, represented by the Bergemann note. The dollar amounts of the obligations are not in dispute. They are obligations arising out of separate and distinct transactions between separate and distinct parties. The well-established rule that claims against an insolvent estate purchased after the decedent's death cannot be set off in an action by the representative of the estate against the purchaser for a debt due the decedent requires a reversal of the trial court's determination. Union Nat. Bank v. Hicks, 67 Wis. 189, 30 N. W. 234; Root v. Taylor, 20 Johns. (N. Y.) 137; In re Schwab's Estate, 68 N. Y. S. (2d) 776; Thompson v. Thompson, 25 Ky. L. 1626, 78 S. W. 418; Irons v. Irons, 5 R. I. 264; Mack v. Woodruff, 87 Ill. 570; Hampton Roads Fire & Marine Ins. Co. v. Coburn Motor Car Co. 158 Va. 675, 164 S. E. 723, 84 A. L. R. 731, with Annotation at 738; Merchants' Bank of Easton v. Shouse, 102 Pa. 488; Cook, Administrator, v. Lovell, 11 Iowa 81; Woodward v. Laverty, 14 Iowa 381; Watkins v. Parker, 97 Ark. 492, 134 S. W. 1187; Van

Dusen v. Topeka Woolen-mill Co. 74 Kan. 437, 87 P. 74; Mitchell v. Rucker, 22 Tex. 66; 34 C. J. S., Executors and Administrators, § 719. We have been cited to no authority which would support a holding permitting a person indebted to an insolvent estate to purchase a claim against such estate and assert it as a setoff in order to escape payment of his own debt.

■ The order in which claims shall be paid in case the estate of the decedent is insolvent is prescribed by Minn. St. 525.44.[1] Upon the death of a decedent, the rights of all his creditors become fixed and the laws of distribution are applicable. Since the estate here is insolvent, it necessarily follows that the creditors will receive only a percentage of their respective claims. We have been cited to no authority which would warrant a holding that the Bergemann note should be granted a preference over the claims of others from whom the decedent borrowed money in the course of his private banking activities. Irons v. Irons, *supra;* Union Nat. Bank v. Hicks, *supra;* 34 C. J. S., Executors and Administrators, § 719, p. 706.

■ The contention that the decision of the trial court should be affirmed because a constructive trust has been established under which the estate holds title for the benefit of Bergemann may be disposed of by brief comment. This is a suit by the Kobergs to cancel their indebtedness by setoff on the basis of an alleged assignment of the Bergemann claim. It is not a suit by Bergemann to seek relief on the basis of an abuse of a fiduciary relationship. It is unnecessary to review here our innumerable decisions on the subject of constructive trusts. Gethsemane Lutheran Church v. Zacho, 253 Minn.

---

[1] Minn. St. 525.44 provides: "If the applicable assets of the estate be insufficient to pay the following in full, the representative shall make payment in this order:

"(1) Expenses of administration;

"(2) Funeral expenses;

"(3) Expenses of last illness;

"(4) Debts having preference by laws of the United States;

"(5) Taxes;

"(6) Other debts duly proved."

469, 92 N. W. (2d) 905; Dietz v. Dietz, 244 Minn. 330, 70 N. W. (2d) 281; Wilcox v. Nelson, 227 Minn. 545, 35 N. W. (2d) 741; Marquette Appliances, Inc. v. Economy Food Plan, Inc. 256 Minn. 169, 97 N. W. (2d) 652; Blumberg v. Taggart, 213 Minn. 39, 5 N. W. (2d) 388; Vesey v. Vesey, 237 Minn. 295, 54 N. W. (2d) 385; Petersen v. Swan, 239 Minn. 98, 57 N. W. (2d) 842; Anderson v. Grasberg, 247 Minn. 538, 78 N. W. (2d) 450; Diedrick v. Helm, 217 Minn. 483, 14 N. W. (2d) 913; Boxrud v. Ronning Machinery Co. 217 Minn. 518, 15 N. W. (2d) 112; 19 Dunnell, Dig. (3 ed.) §§ 9915 to 9924. See, also, 8 Dunnell, Dig. (3 ed.) § 3833; 37 C. J. S., Fraud, § 2c.

It is sufficient for our purpose to say that the imposition of a constructive trust is an equitable remedy intended to prevent the unjust enrichment of a person holding property under a duty to convey it or use it for a specific purpose. Under the facts in this case there is a complete absence of the elements of mutuality and unjust enrichment which would warrant the finding that a constructive trust exists for the benefit of respondents. Moreover, as we have already noted, principles of equity would not warrant giving the Bergemann claim preference over the claims of other creditors.

Reversed and judgment ordered for defendant.