EARL J. HARE, *d. b. a.* EARL J. HARE COMPANY, v. JOSEPH M. BAUER AND ANOTHER.[1]

February 28, 1947.

No. 34,296.

---

[1]Reported in 26 N. W. (2d) 359.

*A. M. Joyce,* for appellant.

*Bundlie, Kelley, Finley & Maun* and *Mandt Torrison,* for respondents.

THOMAS GALLAGHER, JUSTICE.

Plaintiff seeks to recover $400 commission on the sale of certain real property belonging to defendants, and, in addition, the sum of $200 earnest money advanced by him to defendants on behalf of a prospective purchaser of their property.

The trial court found that no sale had been consummated; that no purchaser ready, willing, and able to purchase defendants' premises had been procured; and that the $200 sum advanced by plaintiff to defendants had been paid into district court by defendants and was held there pending proof of its ownership. Plaintiff later dismissed his claim on the $200 item, and it is not before us in this appeal.

On the claim for commission there is some dispute in the evidence. The version most favorable to defendants, which must be taken here, indicates the following: Defendants, Joseph M. Bauer and Emma L. Bauer, his wife, are the owners of a ten-acre tract near White Bear on which are located a bungalow and certain other buildings and equipment used for poultry farming. On or about January 19,

1945, they executed an exclusive listing contract with plaintiff authorizing him to sell a two-bedroom bungalow, frontage 300 feet, ten acres, barn, poultry house, garage, and other described buildings and equipment for $10,000, payable $2,600 down and $50 per month, including interest at five percent on the balance thereafter until paid. No legal description of the premises was included, and they were not otherwise identified in this instrument. Therein defendants agreed to pay five percent commission to plaintiff upon the sale of the property or upon his finding a purchaser therefor ready, able, and willing to buy.

Plaintiff immediately advertised the premises for sale, and shortly thereafter showed the property to Chester A. Hapka and Ella Hapka, his wife, of South St. Paul, prospective purchasers thereof. The Hapkas were interested, but from time to time expressed doubt to plaintiff as to their financial ability to handle the purchase. The record indicates that Mr. Hapka had recently been under surgery and had been ill for some months; that he then was unemployed and drawing only $19.70 a week sick benefits from his former employer, Swift & Company; that he had numerous debts for medical, surgical, and family expenses; that his wife was obliged to work part of the time to take care of the family, which included four small children; that the payments on the home they were then occupying in South St. Paul amounted to only $27.50 a month; and that any purchase of defendants' property depended upon a sale by the Hapkas of the equity in their home.

On March 31, 1945, plaintiff as agent for defendants prepared and executed an earnest money contract providing for the sale of "five acres" to the Hapkas for the sum of $8,000, payable $1,000 down and $50 per month thereafter, and for delivery of possession to them as of May 1, 1945. The agreement further acknowledged receipt of $200 earnest money from the Hapkas. No legal or other description of the property was included therein.

At that time, Mr. Hapka advised plaintiff that he could not make the $200 down payment specified, whereupon plaintiff asked for and received from him his promissory note for $200 payable to plaintiff to

cover this item. At the same time, the Hapkas gave plaintiff a listing for the sale of their own property, anticipating that if it were sold they would be able to make the down payment on defendants' property.

Plaintiff then called the Bauers, advising them that he had procured an earnest money contract for the sale of their property to the Hapkas, and Mr. Bauer later went to plaintiff's office to execute the same. Plaintiff thereupon presented the described contract to him and asked him to sign it. He did not disclose to Bauer the financial situation of the Hapkas or the fact that they were unable to make even the $200 down payment receipted for in the earnest money contract and had given plaintiff their note to cover this item.

Mr. Bauer refused to sign the earnest money contract until the $200 earnest money had been paid over to him. He called attention to the reduction in the sales price from $10,000 to $8,000, and with plaintiff's consent modified the listing arrangement so that plaintiff's commission would be payable in 16 monthly payments of $25 each. Plaintiff then made out and delivered his personal check to Bauer for $200 to cover the earnest money payment described. Bauer thereupon signed the earnest money contract, still unaware that the Hapkas had given plaintiff only their unsecured note to cover the required $200 payment. No delivery of the executed contract to the Hapkas was ever made.

Shortly thereafter, the Hapkas received from Mason & Brown, a real estate firm in South St. Paul, the latter's check for $400 as a down payment on the purchase of the Hapka property there. A few days later, on Sunday, April 29, 1945, plaintiff and his wife visited the Hapkas with a proposed contract for deed covering the purchase of defendants' property. It provided for a purchase price of $8,000, $1,000 in cash and the balance at $50 a month, including interest at five percent. The Hapkas again expressed to plaintiff doubt as to their ability successfully to complete the purchase of defendants' property, but plaintiff assured them it would be all right and that he would stand back of them, although not explaining what he meant thereby.

The Hapkas then executed the proposed contract for deed. They were unable to advance the $1,000 cash referred to. They endorsed and delivered to plaintiff the $400 check representing the down payment on their own property, and executed a new note to plaintiff for $700. These two items were to comprise the $1,000 down payment required on the purchase of defendants' property and, in addition, $100 due plaintiff from the Hapkas for other services performed by him for them. Plaintiff thereupon returned to them their original note for $200.

After plaintiff and his wife left, doubts again assailed the Hapkas, and Mrs. Hapka thereupon called Mrs. Bauer and advised her that they did not have the money to go through with the transaction and could not complete it and that Mr. Hapka would call upon Mr. Bauer the next morning to discuss the matter further. She did not then disclose to Mrs. Bauer that they had previously signed the contract for deed.

The following morning, Mr. Hapka called on plaintiff and advised him that he was unable to go through with the deal. Later that morning he called on Mr. Bauer and told him the same thing. At this meeting Bauer learned for the first time that Hapka had been ill, was unemployed, and heavily in debt, and that he had given plaintiff his note for $200 to cover the earnest money payment. He advised Bauer that the sale of his South St. Paul property had fallen through and that the $400 check he had given plaintiff to apply upon Bauer's down payment was then "no good." Bauer also learned for the first time that a $700 note had been given to plaintiff to cover the balance of the required down payment. He advised Hapka that under the circumstances he would release him from the contract.

Later the same day, Bauer called on plaintiff and criticized him for not disclosing the financial condition of the Hapkas, and in particular that plaintiff had taken the $200 note for the earnest money payment. Plaintiff insisted that the Hapkas were paying $50 a month on their present home, and he demanded that Bauer execute the contract for deed. Bauer refused and withdrew from further negotiations. He testified that had he been advised that the Hapkas

were unable to make even the $200 earnest money payment required he would not have signed the earnest money contract.

A few days later, plaintiff's attorney wrote defendants, insisting that the $700 note from Hapka was held by plaintiff for defendants' account on the sale as a part of the $1,000 down payment required and demanding payment of plaintiff's commission. This action was commenced shortly thereafter.

■ We are of the opinion that the evidence amply sustains the trial court's finding that plaintiff at no time had procured a purchaser ready, able, and willing to purchase defendants' property on terms acceptable to them, an essential prerequisite before plaintiff could claim his commission under the listing agreement. McDonald v. Smith, 99 Minn. 42, 108 N. W. 291; Id. 101 Minn. 476, 112 N. W. 627; Smithburg v. Beaudoux, 171 Minn. 44, 213 N. W. 58.

The evidence establishes without doubt that the Hapkas, the prospective purchasers produced by plaintiff, did not tender the $1,000 cash payment required upon the execution of the contract for deed, and, further, that they were unable to do so; and that because of their poor financial condition they were rejected by defendants. It is clear that plaintiff's personal check for $200, together with the $700 unsecured note of the Hapkas, did not constitute the required $1,000 cash payment specified in both the earnest money contract and the proposed contract for deed. The final letter from plaintiff's attorney to defendants clearly manifested that plaintiff expected defendants to accept this $700 note as a part of the described $1,000 cash payment. Accordingly, defendants were well within their rights in refusing to proceed with the sale and, under such circumstances, plaintiff cannot insist that his commission has been earned.

■ It is urged, however, that when defendants executed the earnest money contract they in effect accepted the Hapkas for whatever was their financial worth and relieved plaintiff from further responsibility in this respect. It is true that ordinarily the execution of an earnest money contract by the vendor manifests his acceptance of the vendee's financial status and relieves the agent procuring the prospective purchaser from further liability on this issue. Goss v.

Stevens, 32 Minn. 472, 21 N. W. 549; Nokleby v. Docken, 134 Minn. 318, 159 N. W. 757; Graham v. Tuchtenhagen, 153 Minn. 422, 190 N. W. 612; Horrigan v. Saeks, 187 Minn. 115, 244 N. W. 545. This rule, however, is subject to limitations. The agent must have dealt fairly with his principal, and if he presents a person known to be incapable of performance and fails to disclose this or other pertinent facts to his principal, he is guilty of fraud and bad faith and forfeits his right to compensation. Francis v. Baker, 45 Minn. 83, 47 N. W. 452; Meyer v. Keating L. & M. Co. 126 Minn. 409, 148 N. W. 452; Lowrie v. Christenson, 165 Minn. 181, 206 N. W. 390; Sinna v. Sperry Realty & Inv. Co. 181 Minn. 183, 232 N. W. 5. When such circumstances are present, the principal may show the prospective purchaser's lack of financial worth; his inability or failure to perform the contract; and, where a contract has been executed prior to discovery of such information, that it would not have been executed had the true facts been known and was cancelled by consent of the parties thereto immediately upon discovery thereof. No liability for the agent's commission arises when such facts are established. Martinson v. Hensler, 132 Minn. 437, 157 N. W. 714, 991; Meyer v. Keating L. & M. Co. *supra.*

Applying these well-settled principles here, it is apparent that plaintiff's failure to disclose to defendants that the Hapkas could deliver only unsecured promissory notes in lieu of the cash payment required by the terms of the sale justified defendants' cancellation of the earnest money contract and their rejection of the Hapkas as acceptable purchasers of their property. This, together with plaintiff's failure otherwise to produce a purchaser ready, able, and willing to purchase the property upon the agreed terms, constituted an effective bar to his claim for commission.

■ Our decision on the foregoing issues makes it unnecessary to discuss the effect of the failure to include in the earnest money contract a legal or identifiable description of the property.

Order affirmed.