[Civ. No. 31513.   Second Dist., Div. Two.   June 28, 1968.]

LAVEANIA COONS, Plaintiff and Respondent, v. RICHARD A. GUNN et al., Defendants and Appellants.

Frederick J. Kling and Kling & Fredland for Defendants and Appellants.

Alfred E. Paonessa, N. E. Youngblood, Ball, Hunt, Hart & Brown and Anthony Murray for Plaintiff and Respondent.

ROTH, P. J.—Husband and wife, owners (herein sellers) of an unimproved parcel of hillside residential property (two lots) contracted by way of an executed realtor's deposit receipt and executed escrow instructions to sell it to appellants husband and wife (herein buyers). Buyers refused to and did not purchase. Sellers assigned their claim for damages to respondent who sued thereon and recovered $20,000, the difference between the contract price and the established reasonable value of the two lots with interest from the date of contract. This appeal is from that judgment.

It is undisputed that one Cole, a licensed real estate salesman employed by one Lindsey, a licensed real estate broker, knew buyers who lived in Encino and had knowledge of the fact that buyers desired to sell their home in Encino. Cole phoned buyers in late December 1964 or early January 1965 and inquired if buyers were still interested in selling their

house. Buyers said yes and added that because of the arrival of a new baby, they were also interested in buying a new home. Cole testified ". . . [s]o I subsequently spent many, many hours looking for property. . . ." He testified that intermittently between the time of the phone call and approximately April 11, showed buyers approximately 11 different parcels of property. As a consequence of an inquiry addressed by Cole " . . . to the girl at the Encino *escrow* . . ." in respect of two dwellings in the Longridge area Cole phoned sellers late in March 1965 and learned that sellers had two lots for sale at $75,000 and received permission from sellers to show the two lots to buyers. Sellers told Cole that he ". . . wanted $75,000 . . . to me [and] . . . didn't care what he sold them for."

Cole showed the two lots to buyers and quoted $80,000 as the purchase price. Buyers liked the two lots and told Cole they would buy. Cole had his employer, Lindsey, draft and sign a deposit receipt dated April 11, 1965, which set forth the purchase price of $80,000, $5,000 payable in escrow, balance in cash upon completion of escrow, other terms and certain contingencies in respect of the purchase. Cole presented it to buyers on the same day who also signed and gave Cole a check for $5,000 to be deposited in the escrow. The same day, late at night at about 11 or 12 o'clock, Cole called sellers whom he had not met and proceeded to their place of residence and sellers signed the deposit receipt. Cole then called buyers whether at midnight of the same day or the next day is not clear, and advised them they had purchased the lot under the conditions as outlined in the offer.

It appears also to be undisputed that before the deposit receipt was drawn and immediately or within a day or two after Cole called owner late in March that Lindsey contacted sellers. Lindsey testified in pertinent part as follows: ". . . I was not particularly satisfied . . . with the reply that Mr. Cole had received from [sellers]. . . . In other words, like I guess most real estate brokers, I want a listing on a piece of property which, in essence, I suppose is an employment contract. It gives us a certain amount of protection. So I called [. . .] and was told . . . that he would accept a net figure and that any amounts over and above that net figure were to be considered the commission, but he would not sign a listing agreement as we know it in the business."

Sellers corroborated this conversation. They testified "Mr. Lindsey said that he understood from Clifford Cole that we

owned two lots over in the Longridge area, that Mr. Cole had a potential buyer for them, and he wanted to send over a listing.

"I told Mr. Lindsey that I would not sign a listing, if he had a buyer to bring me a deposit receipt.

"Q And what did Mr. Lindsey say, if anything?

"A He said that he would if his people came to a point of making an actual purchase."

The conditions outlined in the deposit receipt copied in *haec verba* in the escrow instructions signed the next day, April 12, are: "THIS ESCROW IS CONTINGENT UPON buyers' approval of the preliminary title report and CC&R's and Buyers approval of soil test report, said report to be secured and paid for by buyers herein. Buyers to have five days to approve CC&R's and preliminary title report after they are delivered into their hands. Buyers to have 14 days to secure and approve soil test report after buyer and seller have signed escrow instructions. [Buyer and seller agree to sign escrow instructions within 24 hours of acceptance of this offer.][1] In the event buyers do not notify escrow holder of their disapproval in writing of said contingencies within above named time period said contingencies shall be automatically approved and no longer a part of this transaction. In the event of buyers disapproval of said contingencies, all monies herein deposited shall be refunded to buyers and this transaction shall be null and void. Sellers herein to deliver subject property free of all liens, bonds and assessments."

It is clear too that Cole, prior to or immediately after the date of escrow submitted to buyers *a sketch of the level buildable property on each lot,* that buyers did not rely thereon and ordered an independent survey on April 14, paid for it and that sellers made no representations, express or implied, in respect of level building site.

Between April 11 and 26, buyers made a number of trips to the two lots. Uncertainty arose in their minds as to the size of the building site on one and the size of the swimming pool site on the other. Partial compaction reports originally ordered by, paid for and delivered to sellers on October 9, 1962 and September 6, 1963, were made available to buyers by Cole. Questions arose as to the soil test and as a consequence of one or all of these reasons buyers advised Cole they would not

---

[1]This language copied from the deposit receipt is irrelevant in the escrow instructions.

approve the soil test report unless the purchase price was reduced to $70,000.

On April 26, 1965, an amendment to the escrow instructions was executed by both buyers and sellers which stipulated that the purchase price was reduced from $80,000 to $70,000; the commsision to be paid to the broker was reduced from $5,000 to $4,000 and that the buyers waived all contingencies set forth in the escrow quoted above and stipulating that the escrow would close "sooner but no later than June 12, 1965."

The buyers were temporarily happy with the reduction but further investigation revealed that there were no sewer connections, that septic tanks were forbidden by ordinance and that in order to make proper sewer connections, off-site improvements would have to be made at substantial expense. It should be noted that there is a dispute in the evidence as to whether the facts in respect of sewer connections was discovered prior to the waiver of the escrow contingencies executed April 26, or after. In any event, the buyers asked for an extension of time but almost concurrently with their request, advised the escrow that they did not intend to consummate the deal. They did not.

The trial court made findings, which by reference adopt as fact substantially all the allegations of the complaint of sellers' assignee and negate as fact all the allegations of the affirmative defenses pleaded by buyers. The court concluded that sellers had performed in all respects.

■ However, the trial court found by adopting the allegations of Paragraph XI of the complaint, that Cole and Lindsey, the brokers, were agents of buyers. This finding is erroneous. The evidence does show that the buyers willingly accepted the services of Cole who volunteered to show them properties and willingly used his services in connection with their efforts to consummate the sale outlined above. These facts, however, do not make the brokers the agent of buyers in connection with the sale. (*Hicks* v. *Wilson,* 197 Cal. 269, 273 [240 P. 289]; *Price* v. *Eisan,* 194 Cal.App.2d 363, 365 [15 Cal.Rptr. 202].) The evidence shows without contradiction that although sellers would not give brokers a listing they did accept the offer contained in the deposit receipt drafted by the brokers and agreed to pay the brokers a commission and did thereby employ them for the purpose of consummating the sale. (*Angus* v. *London,* 92 Cal.App.2d 282, 285 [206 P.2d .869].)

Furthermore, the finding is directly contrary to the written

admission of sellers. The deposit receipt signed by sellers and dated April 11, 1965, recites:

"The undersigned [sellers] agrees to pay the above Broker *employed by the undersigned* to sell said property, as commission, the sum of Five Thousand Dollars ($5,000). . . ." (Italics added.)

The escrow instructions signed by sellers, dated April 12, 1965, specifically authorize the payment of $5,000 commission to the broker.

The record is silent as to whether the agreement by the sellers endorsed on a separate part of the deposit receipt at the bottom thereof to employ and pay $5,000 to the brokers, had been signed by the buyers before the sellers had filled in the blanks and added their signature. Also, the escrow instructions, which authorized the $5,000 payment to broker, signed by the sellers, were separately signed and do not bear the signatures of the buyers. There is no finding that buyers knew that the broker was employed by and was to be paid by the seller. As pointed out, the finding is to the contrary. The situation outlined is pregnant with several possibilities. Additional evidence is required to make the relationship between all the parties clear. We are satisfied, however, that on the record before us, the finding that the broker was the agent of the buyers, is not supported by the evidence.

In addition, the trial court by reference found that the allegations in the affirmative defenses are untrue. Yet, one of the affirmative defenses was:

"That it was implied condition of Exhibits A and B [drawings of the two lots] that the subject real property was useable as a residential lot without substantial and expensive grading and compaction or extensive and expensive off-site improvements."

The evidence in respect of the purpose for which the buyers purchased the two lots is undisputed. One of the sellers testifying to a conversation he had with Mr. Cole in respect of the reduction from $80,000 to $70,000 said, referring to Cole "He went on to tell me that the reason why he would not agree to reduce his selling—or his commission beyond $4000 was that he had spent a great deal of time on behalf of the [sellers] to try and find for them and sell to them a useable residential property, and that he would feel or did feel that he would be unable to go below that figure.

"I told him that we would reduce it, and I drew a letter while he was there and in his presence, agreeing to reduce the price subject to those conditions."

In addition, it appears from the record that sellers in a request for admission of facts specifically asked for and buyers made the following admission:

"That prior to April 1, 1965 CLIFFORD COLE showed either one or both of the defendants a number of . . . parcels of improved real property . . . for the contemplated purpose of selling such real property to defendants to be used as a residential dwelling by them."

Although it is undisputed that buyers waived all the contingencies set out in the escrow they never did waive their right to receive a "usable residential property" unless their unquestioned waiver of "soil test" is the sole reason for their asserted defense that the two lots are not "usable residential property." There is no finding other than one negatively made by the trial court that buyers' separate defenses that they were seeking usable residential property was untrue and that the two lots are usable for residential purposes.

█ Code of Civil Procedure, section 632 provides that findings of fact and conclusions of law "shall fairly disclose the court's determination of all issues of fact in the case."

It is settled that findings must be made on all material facts. (*Kaiser* v. *Mansfield*, 141 Cal.App.2d 428, 433 [297 P.2d 98]; *Bertone* v. *City etc. of San Francisco*, 111 Cal.App.2d 579, 586 [245 P.2d 29]; *Hicks* v. *Barnes*, 109 Cal.App.2d 859, 862 [241 P.2d 648].)

█ The finding by reference that the two lots were "usable residential property" is not supported by the evidence. It is clear that sellers knew that the two lots were purchased for this purpose. Buyers, by waiving the soil test and other conditions of the escrow, did not waive the express and implied representation that the two lots they were buying were "usable residential property." The time of waiver of the soil test and the circumstances surrounding it should warrant a specific finding to the effect that when buyers waived the soil test, they accepted the two lots as "usable residential property." There is no such finding.

The defects in the findings pointed out are sufficiently substantial to require a retrial on the merits.

The judgment is reversed.

Fleming, J., and Nutter, J. pro tem.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 21, 1968.

*Assigned by the Chairman of the Judicial Council.