Timothy R. WHITE, et al., Respondents,

v.

Steven P. BOUCHER, et al., Appellants,

Century 21 Christy Realty, Inc., Respondent.

No. 52026.

Supreme Court of Minnesota.

July 30, 1982.

Cloutier & Musech and Cortlen G. Cloutier, Minneapolis, for appellants.

Shirley Reider, Minneapolis, for White, et al.

Anthony R. Soderman, Minneapolis, for respondents.

TODD, Justice.

Timothy and Lori White sought specific performance of a land purchase contract against the vendors, Steven P. and Wanda Boucher. The Whites also named Christy Realty as a defendant. Christy Realty crossclaimed against Boucher for its real estate commission. Following a jury trial judgment for specific performance and damages were awarded to the Whites and Christy Realty was awarded its commission. We affirm the judgment in favor of the Whites, but reverse and remand for further proceedings the judgment in favor of Christy Realty.

On April 3, 1979, the Bouchers entered into a real estate listing agreement with Christy Realty, Inc. (Christy.) Pursuant to the agreement, Christy was to market the Bouchers' home, located in Minnetrista, Minnesota, and in exchange, was to receive 7% of the purchase price of the house as compensation for services rendered. The agent who made the listing for Christy was Dorie Gayda.

Christy showed the Bouchers' home to several prospective purchasers during the month of April. Then, on April 26, 1979, Mary Lynn Albert, a Christy agent, showed the Bouchers' house to the Whites. The Whites were pleased with the home and subsequently returned to the Christy office with Ms. Albert where, at the Whites' request, Albert prepared for the Whites an offer to purchase the Bouchers' house. This purchase agreement called for a purchase price of $57,900 and was predicated on the Whites obtaining an FHA mortgage on the premises. The Whites gave Albert an earnest money check for $1,000 made payable to Christy Realty.

It is undisputed that when the Whites first met Christy agent Mary Lynn Albert, Ms. Albert did a "spot qualification" of the Whites to get an indication of what kind of monthly payments they could afford. It is also undisputed that during the course of this spot qualification, the Whites disclosed to Ms. Albert the nature and extent of their debts and contingent liabilities. These included:

1. Minnesota Housing Finance Agency loan in the amount of $4,000 to $4,500 secured as a home improvement loan on property in the Howard Lake area, previously owned by the Whites and sold by them two years before.

2. Loan secured by dump truck and Blazer 4-wheel drive van owned by the Whites in the amount of $4,500 to $4,795, being paid off on an installment basis of $208 per month.

3. Visa credit card obligation of $700 being paid off at the rate of $50.00 per month.

4. Sears Roebuck obligation being paid off at the rate of $30.00 per month.

5. Master Charge Card obligation being paid off at the rate of $200.00 per month.

6. Loan secured by a motorcycle was being paid off at the rate of $49.00 per month.

7. First mortgage obligation in "mid-$20,000's" on Howard Lake, Minnesota, property, which had been sold and the mortgage assumed, but which continued to be an obligation of the Whites if it was not paid by buyers.

8. First mortgage obligation to Knutson Mortgage Company of around $20,000 on property owned by the Whites in Navarre, Minnesota, which the Whites had assumed and agreed to pay according to its terms.

9. First mortgage obligation of approximately $27,000 owing Knutson Mortgage Company on Radisson Road, Excelsior, Minnesota property, which had been sold and the mortgage assumed, but which continued to be an obligation of the Whites, if not paid by the buyers.

10. Contract for deed obligation on homestead in Salem, Oregon, in the amount of $40,000 being paid in installments of $382.00 per month.

11. Minnesota Housing Finance Agency loan in the amount of approximately $5,000 owing for home improvement loan to property on Vine Street, Excelsior, Minnesota, which was assumed by buyers of said property, but for which the Whites remain liable.

Mary Lynn Albert testified that she did not disclose all this financial information to her principals, the Bouchers.

During the evening of April 26, 1979, Mary Lynn Albert and Dorie Gayda met with the Bouchers at the Boucher's home to deliver the Whites' FHA offer. It is undisputed that the Bouchers summarily rejected the Whites' offer. Wanda Boucher then suggested a contract for deed as an alternative method of financing the sale. With the assistance of Albert and Gayda, the Bouchers then prepared a counteroffer, the terms of which called for a sales price of $55,900, $10,000 down and $450 in monthly payments. The counteroffer set a closing date for May 31, 1979. The Whites accepted the Bouchers' counteroffer on April 27, 1979.

On or about May 4, 1979, the Bouchers sent a letter to the Whites and Christy Realty purporting to rescind the contract for deed purchase agreement.

The letter stated:

"We decided we want to cash out on stated property due to lack of knowledge on inflation of property."

The evidence shows that following the execution of the purchase agreement, but before the decision to rescind was made, both Steven and Wanda Boucher telephoned the Whites and asked whether the Whites could come up with a larger down payment. It appears that the Bouchers found out after they entered into the purchase agreement that $10,000 was simply not enough money to get them into a new house. Steven Boucher testified as follows:

Q. Well, what were—what were your—all your reasons, then, involved in asking for a bigger downpayment?

A. Well, we would have liked to have more money, aw, to get in another house, because our realtor assured us that $10,000 would be enough to get into it. And, aw, we just basically went from there from what she told us.

Q. Well, what are the other reasons besides buying into another house? Did you want more money down?

A. I guess there was none.

Q. So, really, that was the only reason, correct?

A. I believe it was.

Q. So then, let me repeat my prior question then, that you were not asking for more money down because you were feeling financially insecure about the Whites.

A. We did not?

Q. *You did—You were not asking for more money because you were feeling insecure from the Whites.*

A. *No, I wouldn't say so.*

The matter was submitted to the jury on special interrogatories that were answered as follows:

Question Number 1: "Did Timothy R. White and Lori G. White, or either of them, make a false representation to Steven P. Boucher and Wanda M. Boucher, or either of them, or to any representative of Century 21 Christy of a past or present material fact concerning the financial ability of the Whites to comply with the obligations and payments required by the agreement dated April 26, 1979?" Answer: "No."

Question Number 2: No answered required.

Question Number 3: "Did Timothy R. White and Lori G. White in fact have the financial ability to comply with the obligations an payments required by the agreement dated April 26, 1979?" Answer: "Yes."

Question Number 4: "State, in money, the damages sustained by the Whites from

May 31, 1979 to date as a result of the rescission of the agreement by the Bouchers." Answer: "$2,200."

Question Number 5: "Did Century 21 Christy produce purchasers the Whites who were ready, willing, and able to comply with the obligations and payments required by the agreement dated April 26, 1979?" Answer: "Yes."

Question Number 6: "Did Century 21 Christy commit bad faith, disloyalty, or lack of care to the Bouchers?" Answer: "No." The Bouchers appeal from the denial of their motion for amended findings or in the alternative for judgment notwithstanding the verdict or for a new trial.

The issues are:

1. Whether the trial court erred by finding that Timothy and Lori White made no fraudulent misrepresentations concerning their financial ability to comply with the terms of the contract for deed purchase agreement.

2. Whether the trial court erred by finding that Christy Realty Inc. had not breached any fiduciary duty owing its principals, Steven and Wanda Boucher.

■ 1. The Bouchers first claim is that they were fraudulently induced to enter into the real estate contract by the misrepresentations of Tim White concerning his employment status. These alleged misrepresentations were made in a document entitled "Information on Buyer", a form document filled out by the Whites at the request of Christy Agent Mary Lynn Albert. On the form Tim White listed his employer as "G. L. Contracting", and represented that he had been so employed for ten years. The evidence at trial showed that Tim White had in fact been employed as a construction worker for G. L. Contracting for ten years, but that the work was seasonal; there was no work during the winter months. White averaged eight to nine months of work per year for G. L. Contracting over the ten-year period.

The Bouchers' claim of fraudulent inducement is flawed for two reasons. First, both Steven and Wanda Boucher testified that they had *never* seen the "Information on Buyer" sheet that contained the alleged misrepresentations. According to the Bouchers' own testimony, it was therefore impossible for them to have been misled by Mr. White's representations, even if inaccurate or incomplete. In short, there could have been no reliance. Both Mr. and Mrs. Boucher testified that in fact the Whites *had not* made any misrepresentation.

Secondly, the jury has decided the factual issue in favor of the Whites. There is ample evidence to support the finding of the jury as to lack of misrepresentation by the Whites. The evidence supports the award of specific performance and damages to the Whites.

2. In its answer to special verdict question number 6, the jury found that Christy had not breached its duties of good faith, loyalty and care. The trial court adopted the jury's answer as a finding of fact. Appellants now argue that uncontroverted evidence shows Christy violated its fiduciary responsibility in two respects: 1) Christy agents failed to disclose certain financial information concerning the Whites that reflected upon the White's ability to perform the contract, and 2) Christy failed to disclose to the Bouchers that it was also acting as an agent for the Whites in the real estate transaction.

■ Upon the execution of a listing agreement, a broker becomes the agent of the seller and is subject to the general rules governing the principal-agent relationship. *Klawitter v. Billick*, 308 Minn. 325, 242 N.W.2d 588 (1976). The broker owes the utmost good faith and loyalty to his principal. *See Olson v. Penkert*, 252 Minn. 334, 90 N.W.2d 193 (1958). It is the broker's duty to communicate to the seller "all facts of which he has knowledge which might affect the principal's rights or interests." *Magee v. Odden*, 220 Minn. 498, 503, 20 N.W.2d 87, 90 (1945); *Boulevard Plaza Corp. v. Campbell*, 254 Minn. 123, 94 N.W.2d 273 (1959); *Lowrie v. Christenson*, 165 Minn. 181, 206 N.W. 390 (1925). *See Jensen v. Peterson*, 264 N.W.2d 139 (Minn.1978). The broker is duty bound to make full

disclosure of the financial status of a prospective purchaser. *Fulsom v. Egner*, 248 Minn. 156, 79 N.W.2d 25 (1956); *Wold v. Patterson*, 229 Minn. 361, 39 N.W.2d 162 (1948); *Hare v. Bauer*, 223 Minn. 285, 26 N.W.2d 359 (1947); *McGarry v. McCrone*, 97 Ohio App. 543, 118 N.E.2d 195 (1954); *R. A. Poff & Co. v. Ottaway*, 191 Va. 779, 62 S.E.2d 865 (1951); *Farrell v. Score*, 67 Wash.2d 957, 411 P.2d 146 (1966); *Zwick v. United Farm Agency, Inc.*, 556 P.2d 508 (Wyo.1976).

In *Hare v. Bauer*, 233 Minn. 285, 26 N.W.2d 359 (1947), Hare, the seller's real estate agent, failed to disclose to Bauer, his principal, the fact that the prospective purchaser, Hapka, had been ill, was unemployed and was heavily in debt. When Hapka was unable to perform under the terms of the earnest money agreement he had executed, Bauer agreed to release him from the contract. The court held that because Hare had failed to disclose to Bauer the financial condition of the buyer, the agent had forfeited his commission:

> The agent must have dealt fairly with his principal, and if he presents a person known to be incapable of performance and fails to disclose this or other pertinent facts to his principal, he is guilty of fraud and bad faith and forfeits his right to compensation. When such circumstances are present, the principal may show the prospective purchaser's lack of financial worth; his inability or failure to perform the contract; and, where a contract has been executed prior to discovery of such information, that it would not have been executed had the true facts been known and was cancelled by consent of the parties thereto immediately upon discovery thereof. No liability for the agent's commission arises when such facts are established.

*Id.* at 291, 26 N.W.2d at 362 [citations omitted]. In a very similar case, *Fulsom v. Egner*, 248 Minn. 156, 79 N.W.2d 25 (1956), the broker failed to disclose to his principal the fact that the purchaser's ability to make a $4,300 payment on the real estate contract was contingent upon the outcome of a pending lawsuit. The court held that by failing to disclose pertinent information the broker had forfeited his right to compensation:

> Accepting the facts most favorable to the verdict, Egner did not make a full disclosure to the Fulsoms and they executed the earnest money contract without knowledge of pertinent facts. There is further evidence in the record that they would not have done so had they known Mrs. Hanson's ability to raise the $4,300 was dependent upon her receiving money from a lawsuit in which she was involved * * *.

*Id.* at 160, 79 N.W.2d at 30. In *Wold v. Patterson*, 229 Minn. 361, 39 N.W.2d 162 (1949) a real estate broker failed to disclose to his principal the fact that an earnest money check tendered by a prospective buyer was drawn on a bank in which the drawer had no money on deposit. Again, this court held that the failure to disclose constituted a breach of the agent's duty to his principal and that the agent therefore had forfeited all right to compensation under the parties' real estate listing agreement.

■ In the present case, Christy argues that it had no duty to disclose to the Bouchers the financial information provided by the Whites. Christy argues that in a contract for deed, the ability of the buyers to make monthly payments is irrelevant; the security of the seller lies in the fact that he receives a large down payment and can repossess the property in the event of a default. In fact, Christy maintains that "the best thing that could have happened to the Bouchers would have been to take the Whites $10,000 down payment and then recover the property following a default." It appears to be standard practice within the real estate profession to treat the buyer's finances as relatively unimportant in the case of a contract for deed sale.

It would seem, however, that Christy ignores the scope of a realtor's duty to his principal. The agent is bound to disclose to the seller *all* facts of which he has knowledge which *might* reasonably affect the principal's rights and interests. What

might be "the best thing" for the seller must ultimately be the seller's decision, not the agent's. Surely many reasonable sellers rely not only upon down payments, but upon timely monthly payments as well. Furthermore, a seller may not wish to become embroiled in a law suit in the event of the buyer's default. In the present case, the Whites were not wealthy buyers, nor were their financial obligations insignificant.

The conclusion which follows is that Christy failed to disclose pertinent information concerning the White's financial condition, information which reflected upon the White's ability to perform under the contract. Christy therefore breached its fiduciary duty to its principals, the Bouchers. The finding of the trial court to the effect that no duty had been breached is contrary to law.

3. The Bouchers also argue that Christy breached its fiduciary duty by failing to disclose that it also represented the Whites in the real estate transaction. Appellants cite the case of *Olson v. Pettibone*, 168 Minn. 414, 210 N.W. 149 (1926), for the proposition that a contract negotiated by an agent acting for both parties is voidable by a principal who acts without knowledge of the double agency. Christy responds by arguing that no double agency existed in the present case.

A principal-agent relationship results from the manifestation of consent by one person to another that the other shall act on the first person's behalf and subject to his control; and the other must consent so to act. *Tonka Corp. v. Commissioner of Taxation*, 284 Minn. 185, 169 N.W.2d 589 (1969); *Lee v. Peoples Cooperative Sales Agency*, 201 Minn. 266, 276 N.W. 214 (1937); *Witzman v. Sjoberg*, 164 Minn. 411, 205 N.W. 257 (1925). Whether the relationship exists is a question of fact, *Sinna v. Sperry Realty & Investment Co.*, 181 Minn. 183, 232 N.W. 5 (1930), and the party alleging the existence of the agency has the burden of proof. *Farnum v. Peterson-Biddick Co.*, 182 Minn. 338, 234 N.W. 646 (1931).

The general rule is that a real estate broker hired by the owner of land to find a purchaser is ordinarily the seller's agent. Courts often state that a broker is the agent of the person who pays him or first employs him. *See, e.g., Billington v. Crowder*, 553 S.W.2d 590 (Tenn.Ct.App.1977); *Burleson v. Earnest*, 153 S.W.2d 869 (Tex. Civ.App.1941); *Price v. Martin*, 207 Va. 86, 147 S.E.2d 716 (1966). In *Coons v. Gunn*, 263 Cal.App.2d 594, 69 Cal.Rptr. 876 (1968), the court wrote:

> [T]he trial court found * * * that Cole and Lindsey, the brokers were agents of buyers. This finding is erroneous. The evidence does show that the buyers willingly accepted the services of Cole who volunteered to show them properties and willingly used his services in connection with their efforts to consumate the sale outlined above. These facts, however, do not make the brokers the agent of buyers in connection with the sale. The evidence shows without contradiction that * * * sellers * * * agreed to pay the brokers a commission and did thereby employ them for the purpose of consumating the sale.

69 Cal.Rptr. at 879 [citation omitted].

An exception to the general rule that a broker is ordinarily the agent of the person who pays the real estate commission can be found in the case of *Duffy v. Setchell*, 38 Ill.App.3d 146, 347 N.E.2d 218 (1976). In *Duffy*, the real estate agent was first approached by the buyer, the agent had had no prior contact with the seller, and the buyer considered the real estate agent to be her agent. Although the agent was eventually to be paid by the seller, the Illinois court held that a double agency had been created:

> If a buyer requests a broker's assistance in obtaining a particular piece of property, the broker may be held to be the buyer's agent for that transaction, even though the broker is paid nothing by the buyer and it is expected that he will receive a fee from the seller. If the broker then becomes the seller's agent as well, the duties he will owe the two parties will be conflicting, and he will not be

able to act for both without the knowledge and consent of both of them.

347 N.E.2d at 221 [citation omitted].

In *Lerer v. Arvida Realty Company*, 134 So.2d 798 (Fla.App.1961) the court emphasized the fact that the agent in that case was neither paid by the purchaser, nor subject to the purchaser's *control* during the course of negotiations:

> The record does not reflect that defendant Utterback [the agent] was subject to orders and directions of Lerer [the purchaser] as exists in an agency situation. Utterback was to be paid by Arvida [the seller], and neither Lerer nor Richmond had paid or agreed to pay him anything in connection with the purchase of the property. Thus, there was no genuine issue of material fact as to whether or not Utterback was Lerer's agent.

*Id.* at 800.

In the present case, the evidence shows that Christy agents first made a preliminary determination as to what type of home the Whites could afford, and then showed the Whites several pieces of property, including the Bouchers'. When the Whites expressed an interest in the Bouchers' home, Christy agent Mary Lynn Albert helped the Whites prepare an offer. There is no evidence to suggest that Christy agents acted at the White's direction or were subject to their control. Nor is this a case such as *Duffy*, in which the purchaser first contacted the real estate agent with a particular parcel of property in mind. Here it was the Bouchers who first employed Christy and agreed to pay a real estate commission in exchange for the agent's services.

The decision of the trial court in ordering judgment for the White's is affirmed. The evidence does not establish a matter of law that the Bouchers were fraudulently induced by the Whites to enter into the real estate contract, nor does the evidence show that Christy acted as a dual agent in this real estate transaction.

The record does indicate that Christy breached its fiduciary duty by failing to disclose to the Bouchers pertinent financial information concerning the Whites. The fact that a complete disclosure was not made, however, does not necessarily result in a forfeiture of Christy's commission; that is, the breach of fiduciary duty must have been a material breach. In *Hare v. Bauer*, the court allowed a forfeiture upon a showing that the seller would not have entered into a contract with the buyer had the true facts been known. Similar findings were made in both *Fulsom v. Egner*, and *Wold v. Patterson*. In the present case, the jury found that no breach of fiduciary duty occurred. The trier of fact therefore did not consider whether any breach of the agent's duty to disclose was actually material, i.e., whether the Bouchers would have entered into the purchase agreement with the Whites even had they known of the Whites' debts and contingent liabilities. The matter is remanded in part for the limited purpose of determining the materiality of Christy's failure to disclose financial information concerning the Whites.

Affirmed in part, reversed in part.

KELLEY, J., took no part in the consideration or decision of this case.