In re Madison Y. MEAHYEN and
Cita A. Meahyen, Debtors.

Krisanus Medlock, Plaintiff,

v.

Madison Y. Meahyen, Defendant.

Bankruptcy No. 09–42346.
Adversary No. 09–4127.

United States Bankruptcy Court,

D. Minnesota.

Feb. 4, 2010.

April M. Little, Brooklyn Center, MN, for Debtor.

Craig D. Greenberg, Huffman Usem Saboe Crawford & Greenberg, Minneapolis, MN, for Plaintiff.

## *MEMORANDUM OPINION AND ORDER*

ROBERT J. KRESSEL, Bankruptcy Judge.

At Minneapolis, Minnesota, February 4, 2010.

This adversary proceeding came on for trial on December 15, 2009 on Krisanus Medlock's complaint seeking a determination that Madison Y. Meahyen's debt to him is nondischargeable. Craig D. Greenberg appeared for the plaintiff. The defendant appeared *pro se*. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 1334, and Local Rule 1070–1. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(I).

## FACTS

1. The plaintiff, Krisanus Medlock, met the defendant, Madison Meahyen, through Krisanus's sister, Paula Medlock.

2. Paula worked with Madison in the Minneapolis Star Tribune newsroom for ten years.

3. Madison was involved in real estate enterprises outside of his employ-ment at the Star Tribune. Madison discussed real estate investing with Paula, beginning in the 1990's.

4. Paula was interested in making extra money. Although Paula had no previous real estate experience, Madison convinced her to invest in several residential properties.

5. Madison was a licensed real estate agent. He was employed as an agent by Coldwell Banker Burnet.

6. In 2005, Madison showed several properties to Paula and told her they were "moneymakers." All she had to do was purchase the properties, allow his company (Nimbatun Properties, Inc.) to rehab them, and sell them for "instant equity." He only showed Paula properties he owned. He promised to mentor her, hold her hand, and find tenants for her. Paula purchased three properties from Madison over six months.

7. Paula was under the impression that Madison would even make the mortgage payments for her. It was not clear whether Madison actually made any payments for her, but she very quickly became delinquent.

8. Around that time, Madison asked Paula to look at another one of his properties. Paula realized she was in over her head with the three properties she had already purchased. Her brother, Krisanus, had expressed an interest in real estate investment, so she passed the information along to him.

9. Krisanus had business experience but not in real estate. He had worked primarily in sales. He was about to become a new father and was looking for an additional

source of income to provide for his growing family.

10. Paula arranged a meeting between Krisanus and Madison in January of 2005. Krisanus met Paula and Madison at a duplex owned by Madison, at 1819 15th Avenue South, Minneapolis, Minnesota. Madison introduced himself as a Coldwell Banker real estate agent. He told Krisanus that he owned the property and wanted to sell it to him.

11. At their initial meeting, Madison gave Krisanus a Coldwell Banker folder, which included his Coldwell Banker Realtor business card and an investment proposal prepared specifically for Krisanus.[1]

12. The investment proposal included the following statement: "Objective: Purchase and complete renovation of this Two Family Dwelling, 5–bd upper, and 3–bd lower; improve to code, and ready for occupancy by July 1, 2005. Plan: Holding Long Term or 3–5 Years." It also included the following list of "project tasks" and costs (in dollars):

| Budget Estimates | 272,000 |
| --- | --- |
| Purchase (Contract Price) | 203,000 |
| Closing Costs | 6,200 |
| Total Purchase Costs (at Closing) | 209,200 |
| *Renovation/Improvements* | |
| City Permits | 3,250 |
| New Heating Sys. (2 Forced Air Sys. & Duct) | 9,600 |
| Electrical Service Update to Code | 7,250 |
| Plumbing (Update Pipping [sic], Installation & Labor) | 7,490 |
| Plumbing fixtures, i.e. bath tubs, water heater, faucets, valves, toilets ar [sic] | 2,350 |
| Roofing Repairs | 4,200 |
| Framing—Interior Rooms/Baths | 3,600 |
| Windows/Doors Repairs, Hardware, Etc | 3,850 |
| Drywall Installation | 4,175 |
| Carpet/Flooring | 7,500 |
| Painting (Prepping, Sanding, Spraying—Labor & Material) | 4,550 |
| Landscaping, Trees/Trimed [sic], Fence, Sod | 900 |
| OTHER: Miscellaneous/Adjustments | 1,200 |
| incl. basement clea [sic] up/tuckpoint/repairs, garage, dumpster, transportation, tools, extra labor costs (i.e., daily labor/help, etc.) | |
| Allowance for Unexpected Expenses, etc. | 2,000 |
| Estimated Renovation/Improvement Costs | 61,915 |
| **Total Project** | **271,115** |
| Estimated Market Value | 340,000 |
| *Equity (est.)* | *68,885* |

13. Madison told Krisanus that the numbers were "pretty solid." Madison told Krisanus that he had been through the house, and was familiar with its condition, the work that needed to be done, and the cost of the work. Although he knew that construction rarely came in on budget, he did not tell Krisanus that there was a strong likelihood that the project would go over budget. He also admitted that he knew his estimates did not include a profit for himself, although he expected to make money on the project. The documents also included the statement, "Seller believes this is a good rehab project; the potential benefits and returns outweigh the potential risks." Madison admitted that he gave Krisanus the document with the intent that Krisanus would rely on his estimates. Madison told Krisanus that he wanted him to make $200,000 in three to four years by purchasing, rehabbing, and then selling properties.

14. Madison told Krisanus that Krisanus was "virtually guaranteed"[2] to

---

1. Minn. Stat. § 82.41 subd. 6 (2009) provides: "No person licensed pursuant to this chapter or who otherwise acts as a real estate broker or salesperson shall fail to provide at the first substantive contact with a consumer in a resi- dential real property transaction an agency disclosure form as set forth in section 82.22."

2. Minn. Stat. § 82.41 subd. 11 (2009) pro- vides: "Licensees shall not, with respect to the sale or lease of real property, guarantee or

make money on the project. Madison told Krisanus not to get a real estate agent because it would cost money, but that he would represent him in both buying and later selling the property, he would guide him through the process, and his own company would do the renovations. Madison repeated the statement in the investment proposal documents that the property was a good investment and the "potential benefits outweighed the potential risks." Krisanus believes Madison promised that he would help pay the carrying costs until the property was resold, including Krisanus's monthly interest payments. Madison told Krisanus that the asking price, $203,000, was "a fair price," even though he had purchased it not long before for only $150,000 and had spent only $5,000 on maintenance and repairs.

15. Krisanus knew that Madison had undertaken property improvement projects in the past, including the projects with Krisanus's sister, Paula. He trusted Madison and believed his representations.

16. Based on Madison's representations, Krisanus decided to purchase the property and work with Madison's company, Nimbaturn Properties, Inc., to renovate it.

17. Nimbatun Properties, Inc. is wholly owned by Madison. Nimbatun is an unlicensed general contractor with no employees. It subcontracts all work. Although Krisanus initially believed that Nimbatun had its own employees, as early as February 17, 2005 Krisanus was copied on subcontractor bids.

18. Madison never recommended that Krisanus hire a housing inspector to evaluate the property, even though such inspections are common. Madison never provided Krisanus with a Truth in Housing[3] report. Madison prepared the purchase agreement himself.

19. On February 18, 2005, Krisanus borrowed $276,000 from Cornerstone Mortgage and Marshall Bank for the purchase and renovation of the property. Krisanus purchased the property at 1819 15th Avenue South from Madison for $203,000. Madison did not disclose his profit of nearly $50,000.[4]

---

affirmatively encourage another person to guarantee future profits or earnings that may result from the purchase or lease of the real property in question unless the guarantee and the assumptions upon which it is based are fully disclosed and contained in the contract, purchase agreement, or other instrument of sale or lease."

3. Minneapolis, Minn., Mun. Code ch. 248, § 20 provides: "Any owner or representative of the owner who makes available for sale any single- or two-family dwelling, townhouse, first time condominium conversion that is not condemned requiring a code compliance, by implementing any of the following actions including, but not limited to, advertising the sale of the dwelling, entering into a listing agreement to sell the dwelling or posting a sign that the dwelling is for sale, shall, within three (3) calendar days of any such action, have an evaluation by a licensed evaluator." There was no evidence that Madison advertised the dwelling for sale, entered into a listing agreement to sell it, or posted a sign that it was for sale. It is therefore not clear whether Madison was under an obligation to obtain a Truth in Sale of Housing report and provide it to Krisanus prior to the sale, even though it would have been prudent.

4. Real estate brokers in Minnesota are subject to a number of statutory and common law duties, including a broad duty of disclosure. *See* Minn. Stat. § 82.41 subd. 13 (2009) (providing that the following acts, if performed by

20. Madison and Krisanus immediately began planning the renovation work on 1819 15 Avenue South. The work orders that Krisanus signed with Madison reflected costs that were substantially the same as or even less than the estimates Madison had provided on the project task document. Around the same time, Madison signed several work orders with subcontractors and some of the subcontractors began work. Madison pulled work permits in his own name, identifying himself as the property owner.

21. In March, Madison told Krisanus about a second property, located at 2640 Dupont Avenue North in Minneapolis, Minnesota. On March 29, 2005, Madison copied Krisanus on an e-mail to Rob Bonahoom (the Cornerstone Mortgage broker who worked with Krisanus and Madison on the purchase of the first property). Madison wrote that the property did not need much work, "though new siding and carpeting will really make it stand out. Asking way below actual value to make room for everyone. He [Krisanus] stands to earn at least $40k (plus) on this one. Work to be completed in about 45 days, since it's been updated twice in '99 and '02." Although Madison had purchased the property in 1999 for only $99,000 or $150,000 (there was conflicting evidence), he proposed to sell it to Krisanus for $177,000.

22. Madison prepared an investment proposal for the 2640 Dupont Avenue North property that was similar to the proposal for 1819 15th Avenue South. The stated objective was: "Purchase and complete renovation of this Single Family Dwelling, 5–bd 2ba; improve and ready for occupancy by August 1, 2005. Plan: Holding Long Term or 3–5 Years." The estimated renovation cost was between $31,525 and $32,525, and included a budget of $9,000 for siding. Again, Madison and Krisanus agreed that Madison's company would do the work.

23. Madison prepared the purchase agreement, and Krisanus purchased the 2640 Dupont Avenue North property from Madison on May 3, 2005.

24. Krisanus received the Minneapolis Truth in Sale of Housing Disclosure Report for 2640 Dupont Avenue North a week *after* closing.

25. On May 23, 2005, Krisanus and Madison signed a work order for new siding for the 2640 Dupont

a licensed real estate agent, are fraudulent, deceptive, and dishonest practices: "(2) act in the dual capacity of licensee and undisclosed principal in any transaction;" "(9) make any material misrepresentation or permit or allow another to make any material misrepresentation;" "(10) make any false or misleading statements, or permit or allow another to make any false or misleading statements, of a character likely to influence, persuade, or induce the consummation of a transaction contemplated by this chapter;" and "(11) fail within a reasonable time to account for or remit any money coming into the licensee's possession which belongs to another.");

*White v. Boucher,* 322 N.W.2d 560 (Minn. 1982) (real estate broker's failure to disclose was a breach of his duties of good faith, loyalty and care); *Wold v. Patterson,* 229 Minn. 361, 39 N.W.2d 162, 163–64 (1949) (real estate broker who failed to disclose a material fact forfeited his right to compensation from the principal); 25 Minn. Prac., Real Estate Law § 1:16 (2009–2010 ed.) ("Disclosure is one of the common-law agency duties that Minnesota real estate brokers owe their principals. The *duty to disclose* requires the broker to divulge all material facts of which the broker has knowledge and that might affect the client's rights or decisions.").

Avenue North property. For $9,000, Madison agreed to 1) remove and discard all old or existing cement board siding from the exterior of the dwelling; 2) repair or replace as needed any exterior wood under the existing siding; 3) install sealant where needed and wrap the exterior of the dwelling with Tyvec under seal; and 4) install new vinyl siding on the exterior of the dwelling in a professional manner.

26. Krisanus became concerned about Madison's management of the renovations at the 1819 15th Avenue South property. Workers began walking off the job. Krisanus asked them why, and they explained that they had not been paid for their work. This was surprising to Krisanus because Madison had been regularly requesting draws on the construction loan account for the purpose of paying subcontractors.

27. Around the same time, Krisanus heard from the bank that the construction loan funds were nearly depleted, despite the fact that construction was nowhere near completion.

28. Even though Madison was working on the project as a general contractor, he signed lien waivers for his subcontractors. He had no authority to sign the lien waivers.

29. Madison hired Bernie Battle to upgrade the electrical system at the 1819 15th Avenue South Property. Battle had bid $5,000–$6,000 for the work. After Battle had completed half of the work, Madison wrote him a check for $3,000. The check bounced. When Krisanus found out, he made a new deal with Bat-

tle and promised to pay him the full amount due if Battle would finish the job. Battle agreed. He finished the job, and Krisanus paid him in full.

30. Although Krisanus maintained records of the construction and the loan activity, Madison provided no evidence as to how he spent the funds. Madison admitted at his deposition that after making a draw request from Krisanus's construction loan account, he would not always use the funds to pay the proper party.

31. Krisanus terminated the construction contracts with Madison and finished the renovation of the 1819 15th Avenue South property on his own. Very little work had been completed, and a lot of problems had surfaced. The house had been stripped. The plumbing was only roughed in but nowhere near completion. The roof was not finished, and in fact, during a storm, the house sustained serious water damage. The furnace did not work, and when Krisanus called the contractor he said that he had not been paid. Workers discovered a problem with the foundation, which required the property to be lifted so that support could be inserted. The drywall was in terrible condition.

32. Despite all of the setbacks, Krisanus completed the renovation by February of 2006. After exhausting the construction loan funds, he spent an additional $70,000 of his own money to finish the project.

33. The second property, 2640 Dupont Avenue North, was in bad shape, too. Although Madison had taken $30,000 for the work, the only work

he completed was removal of the existing siding.

34. Krisanus attempted to sell both properties but he was unable to find buyers. He had appraisals done and learned that the houses were never worth what he had paid. He decided that the work to be done on the 2640 Dupont Avenue North was cost-prohibitive, and he was not able to refinance it to pay for repairs. The bank foreclosed on 2640 Dupont Avenue North on October 3, 2007. The foreclosure has lowered Krisanus's credit rating. He was unable to refinance his home due to the foreclosure.

35. Krisanus initiated litigation against Madison in Hennepin County District Court in 2007. That litigation is on hold, pending the resolution of this adversary proceeding. When Coldwell Banker Burnet learned of the Hennepin County litigation, it terminated Madison's employment. Madison is no longer a licensed real estate agent.

## ANALYSIS

The plaintiff seeks to except the defendant's debt to him from his discharge under 11 U.S.C. §§ 523(a)(2)(A), 523(a)(4) and 523(a)(6). "Exceptions to discharge are construed narrowly. The burden of proving that a debt falls within a statutory exception is on the party opposing discharge." *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir.1988) (internal citation omitted).

### 523(a)(2)(A)

Section 523(a)(2)(A) provides that a chapter 7 discharge:

(a) ... does not discharge an individual debtor from any debt—... (2) for money, property, services, or an extension,

renewal, or refinancing of credit, to the extent obtained by—(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). In order to prevail under this section, the plaintiff must show:

(1) the debtor made a representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor made the representation deliberately and intentionally with the intent and purpose to deceive the creditor; (4) the creditor justifiably relied upon such representation; and (5) the creditor sustained injury as a proximate result of the representation.

*Gadtke v. Bren (In re Bren)*, 284 B.R. 681, 690 (Bankr.D.Minn.2002); *see also Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340 (8th Cir.1987); *Fee v. Eccles (In re Eccles)*, 407 B.R. 338, 341–42 (8th Cir. BAP 2009). "Actual fraud, by definition consists of any deceit, artifice, trick or design involving direct and active operation of the mind, used to circumvent and cheat another-something said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Merchs. Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 790 (quoting *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1293 (5th Cir.1995)).

The plaintiff alleges that the defendant made the following misrepresentations: 1) that purchase of the properties was an advisable investment; 2) that the "potential benefits [of the purchases and rehabilitation projects] outweigh the potential risks"; and 3) that the sale price offered to the plaintiff was fair when in fact it was inflated over market value. The plaintiff also alleges that the defendant failed to disclose the following: 1) that he was mak-

ing a large profit on the sales of both properties; 2) that he was not a licensed general contractor; 3) that he did not have sufficient resources to complete the renovation work at the properties; and 4) that no housing inspection had taken place prior to the sales. The defendant also made false representations when he transmitted unauthorized mechanics lien waivers to the plaintiff. *See Bren,* 284 B.R. at 693. In response, the defendant admitted to making all of the representations except that he maintains that the price was not inflated over market value. In general, I find the defendant's testimony to lack credibility. It was riddled with inconsistencies and contained implausible explanations, such as his explanation that he agreed to manage the renovations as a favor to the plaintiff because the plaintiff did not know what to do next with the properties. In addition, he represented the costs of renovation in the budget estimates to be accurate, when in fact Madison made no attempt to determine the actual costs.

 I find that the defendant made all of the representations and omissions alleged by the plaintiff. However, "To qualify as a false representation or false pretense under 11 U.S.C. § 523(a)(2)(A), the statement must relate to a present or past fact." *Bren,* 284 B.R. at 690. Not all of the representations and omissions cited by the plaintiff related to a present or past fact; some were merely opinions. *See Minn. Client Sec. Board v. Wyant (In re Wyant),* 236 B.R. 684, 697–98 (Bankr. D.Minn.1999) ("The falsity of an opinion is not easily subject to determination, if at all, except in hindsight. In fact, an opinion cannot really be false at its moment of utterance because whether it is the right or wrong assessment of a situation may only be finally evaluated, if at all, at some later time."). Ordinarily, this would include the defendant's statements regard-

ing the advisability of the investments and the fairness of the price. However, the defendant admitted in his answer that he acted as the plaintiff's real estate agent when he sold him the two properties. He held himself out as a real estate agent, and acted as a real estate agent in showing the plaintiff properties, guiding him through the buying process, and preparing the purchase agreements. The defendant told the plaintiff that he would act *on his behalf* in the purchase, renovation, and eventual resale of the properties and failed to disclose that they had adverse interests. Specifically, as a purchaser, the plaintiff had an interest in minimizing his costs, while the defendant, as a seller and general contractor, had an interest in maximizing his profits. This created an immediate conflict. Although this would be obvious in an arms-length transaction, the plaintiff would not be expected to suspect that his own real estate agent was working against his interests.

The defendant, as an agent, had the duty to fully disclose his conflict of interest and his profits, but breached his duty repeatedly. The defendant represented to the plaintiff that he was familiar with the condition of the properties, the work that needed to be done, and the cost of the work, but he failed to disclose that there was a strong likelihood that the projects would go over budget. He also had a duty to disclose that his opinions as to the advisability of the investment were self-serving and not based on an objective, informed, professional review. Although the plaintiff knew the defendant owned the properties, he had no reason to suspect that the price offered by the defendant was significantly more than the actual current value. The closing documents for the second purchase noted a large amount of cash would be paid to the defendant at closing, but a buyer would not necessarily have concluded that the cash was pure

profit. A buyer might have assumed it was for equity in the property as a result of repairs that the seller had made, or as a result of the seller paying down the original loan. It did not relieve the defendant of his duty to specifically disclose his profit to the plaintiff. The plaintiff was entitled to rely on his agent's representations regarding the price, and was entitled to know that the defendant was not selling the properties for their *current* value. Finally, when the defendant signed unauthorized lien waivers, he was falsely representing that the subcontractors had been paid.

■ "A false representation made under circumstances where [the maker] should have known of the falsity is one made with reckless disregard for the truth, and this satisfied the knowledge requirement." *Moen*, 238 B.R. at 791 (quoting *F.T.C. v. Duggan (In re Duggan)*, 169 B.R. 318, 324 (Bankr.E.D.N.Y.1994)). According to the Restatement (Second) of Torts, "A misrepresentation is fraudulent if the maker (a) knows or believes that the matter is not as he represents it to be, (b) does not have the confidence in the accuracy of the representation that he states or implies, or (c) knows that he does not have the basis for his representation that he states or implies." Rest. (2d) Torts § 526 (1977). The defendant was a licensed real estate agent employed by a reputable real estate agency at the time that he made the false representations to the plaintiff. There is no doubt that the defendant knew or should have known that his representations to the defendant were false. In addition, he knew or should have known that the plaintiff would rely on his cost estimates, since he told the plaintiff that his own company would do the construction, that he was familiar with the property and work that needed to be done, and that he

had renovated similar properties in the past.

■■ The defendant made the representations deliberately and intentionally with the intent and purpose to deceive the plaintiff. "Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act." *Moen*, 238 B.R. at 791 (quoting *Duggan*, 169 B.R. at 324). The defendant admitted that he intended for the plaintiff to rely on his representations. He knew or should have known that his statements regarding the properties and his ability to renovate them would induce the plaintiff to purchase the properties and hire his contracting company for the renovations. He also knew or should have known that by signing the mechanics lien waivers, the plaintiff would be deceived into believing that the subcontractors were being paid and therefore induce the plaintiff to continue to provide construction loan funds to the defendant to continue the project.

■ The plaintiff justifiably relied upon the defendant's representations. "Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." *Field v. Mans*, 516 U.S. 59, 70–71, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995) (quoting Rest.2d Torts § 545A). The plaintiff trusted the defendant because the defendant agreed to act on his behalf as his real estate agent in the purchase, renovation, and eventual resale of the properties, and because the defendant claimed to have a special knowledge of the properties, the work to be completed, and the cost of

the work. The defendant assuaged all of the plaintiff's concerns about the projects by promising to guide him through the process, oversee the renovations himself, eventually help him resell, and even contribute to the carrying costs. As the project went on, he signed the lien waivers, which led the plaintiff to believe that the subcontractors were being paid for their work, even as the defendant was bouncing checks and misusing the funds. When the plaintiff discovered that work was not being completed and that subcontractors were not being paid, he kicked the defendant off the job and paid the subcontractors himself, even though the project funds had been depleted. It was unwise of the plaintiff to place so much trust in the defendant, but under the circumstances, his reliance was justifiable.

I find that the defendant obtained "money, property, services, or an extension, renewal, or refinancing of credit" by false representations, but even if the facts of this case did not support a finding of false representations, the defendant's acts were clearly wrongful are dishonest and also fit within the definition of false pretenses. "[T]he concept of 'false pretenses' contemplates 'a series of events, activities or communications which, when considered collectively, create a false and misleading set of circumstances, or false and misleading understanding of a transaction, in which a creditor is wrongfully induced by the debtor to transfer property or extend credit to the debtor.'" *Check Control, Inc. v. Anderson (In re Anderson)*, 181 B.R. 943, 950 (Bankr. D.Minn.1995) (quoting *In re Dunston*, 117 B.R. 632, 639 (Bankr.D.Colo.1990)). All of the defendant's actions and representations were designed to mislead the plaintiff in order to convince him to purchase properties and enter into a construction contract, when the defendant knew or should

have known that the plaintiff would not be able to make a profit on the renovation and eventual resale of the property because the purchase price was artificially inflated and construction would not come in anywhere close to his budget. As the projects went on, the defendant's words and conduct were intended to induce the plaintiff to continue paying him under the false belief that subcontractors were being paid and work was being completed.

Because I have found that the defendant's debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A), I do not need to address the plaintiff's claims under 11 U.S.C. § 523(a)(4) or (a)(6).

## DAMAGES

Although the plaintiff has asked for a money judgment, I conclude that the liquidation of damages is better determined in the state court and I abstain in favor of the Hennepin County District Court.

## CONCLUSION

For the reasons stated above, I conclude that the has plaintiff met his burden under 11 U.S.C. § 523(a)(2)(A). The defendant took advantage of the plaintiff's trust and intentionally deceived him in order to secretly profit from the transactions and induce the plaintiff to continue paying him for construction work that he knew he would not be able to complete. The defendant's dishonest conduct justifies excepting from his discharge his debt to the plaintiff as determined by the Hennepin County District Court.

## ORDER

IT IS ORDERED:

The defendant's debt to the plaintiff is excepted from the defendant's discharge.

LET JUDGMENT BE ENTERED AC-CORDINGLY.