In re Bruce Peter BREN and Barbara A. Bren, Debtors.

David W. Gadtke and Donna A. Gadtke, Plaintiffs,

v.

Bruce Peter Bren and Barbara A. Bren, Defendants.

Bankruptcy No. 01–45166.
Adversary No. 02–8016.

United States Bankruptcy Court,
D. Minnesota.

Oct. 22, 2002.

Jan Stuurmans, Minneapolis, MN, for defendants

David B. Galle, David E. Runck, James M. Jorissen, Minneapolis, MN, for plaintiff.

## MEMORANDUM ORDER DETERMINING DISCHARGEABILITY OF A DEBT

ROBERT J. KRESSEL, Bankruptcy Judge.

This proceeding came on for trial on September 30 and October 1, 2002. David B. Galle, David E. Runck, and James M. Jorissen appeared for the plaintiffs, David and Donna Gadtke. Jan Stuurmans appeared for defendant Bruce Peter Bren.

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding under 28 U.S.C. § 157(I).

### THE PARTIES

Bruce Bren, from 1979 until approximately December 2001, was employed by Bruce Bren Homes, Inc., a closely-held corporation formed under Minnesota law,

as a licensed residential real estate contractor. Bren was the President of BBHI and a 50% shareholder. Barbara A. Bren[1] owned the remaining 50% of BBHI. The last few years, BBHI was engaged in the business of constructing luxury single-family and multi-family residential homes and townhouses.

On October 23, 2000, the Gadtkes, entered into a Residential Dwelling Building Agreement with BBHI, which Bren executed on behalf of BBHI. Pursuant to this agreement, BBHI agreed to build a single family residential home for the Gadtkes in Edina, Minnesota for $1,273,636.00. With regard to the payment of the contract price, the Building Agreement stated:

> The contract price shall be paid in the following installments: $191,046.00 (15%) shall be paid upon signing of the contract; $191,046.00 (15%) shall be paid upon completion of the roof framing (also known as installation of roof trusses);
>
> $191,046.00 (15%) shall be paid upon installation of the windows;
>
> $191,046.00 (15%) shall be paid upon installation of the drywall;
>
> $191,046.00 (15%) shall be paid upon delivery of millwork;
>
> and the balance of $318,406.00 (25%) shall be paid the date of closing.

In exchange, BBHI expressly promised in the Building Agreement to furnish the necessary materials, perform necessary labor through qualified subcontractors, and to construct the new residence in a workmanlike manner according to the approved plans, specifications, and in accord with all applicable governmental laws, rules and regulations.

On October 23, 2000, the Gadtkes made the down payment of $191,046 to BBHI. Construction of the Gadtkes' home began in November of 2000. On February 5, 2001, BBHI sent an invoice to the Gadtkes for $191,046, stating that the roof framing had been completed and under the Building Agreement the first progress payment was due. After receipt of this invoice, David Gadtke also received a pre-lien notice on his home from subcontractor Scott Builders. The notice informed the Gadtkes of their right to pay Scott Builders directly unless they received a mechanic's lien waiver from BBHI. Gadtke called BBHI and requested copies of signed mechanic's lien waivers from subcontractors who performed work on his home, an accounting of the subcontractor costs incurred, and payments made to date on the project. On February 19, 2001, David Schmidtlein, BBHI's office manager, faxed the Gadtkes a *"Contract vs. Costs to Date"* spreadsheet showing the costs for labor and materials incurred by BBHI to date on the Gadtkes' home. According to the spreadsheet, the costs totaled $239,242.72.[2]

Noticing that the *"Contract vs. Costs to Date"* spreadsheet did not contain information detailing the amount that BBHI actually paid to subcontractors for materials and work done, Gadtke requested an expanded spreadsheet that detailed such payments. On February 21, 2001, Schmidtlein faxed a *"Contract vs. Costs to Date vs. Paid to Date"* spreadsheet to the Gadtkes. This second spreadsheet stated that the costs totaled $239, 221.03[3], and the amounts paid by BBHI for labor and materials on the Gadtkes' home as of February 20, 2001 were $171,762.94. Upon receiving this report, David Gadtke requested copies of the subcontractor me-

---

1. By stipulation filed September 25, 2002, Barbara A. Bren was dismissed as a defendant. Future references to the defendant or to Bren will mean Bruce Peter Bren.

2. This amount included a $25,292.85 contractor's fee.

3. This amount differs from the first spread sheet by $21.69.

chanic's lien waivers. On March 1, 2001, Schmidtlein faxed the Gadtkes copies of the four lien waivers from subcontractors, totaling $115,514.88 and acknowledging receipt of payment from BBHI.[4] Also included within this faxed information was a lien waiver executed by Bren on behalf of BBHI in the amount of $75,531.12, bringing the total amount paid to date on the Gadtkes' home to $191,046.00, the amount of their initial down payment under the Building Contract. On March 1, 2001, the Gadtkes made the first progress payment, and their second payment overall, to BBHI in the amount of $191,046 pursuant to the terms of the Building Agreement.

On May 31, 2001, BBHI sent a second invoice to the Gadtkes stating the second progress payment of $191,046 was due under the Building Agreement because the installation of the windows, the second construction benchmark, was complete. Upon receipt of this invoice, David Gadtke requested from Schmidtlein copies of the mechanic's lien waivers signed by subcontractors and suppliers. On June 4, 2001, Schmidtlein faxed to the Gadtkes a third spreadsheet entitled *"Contract vs. Costs to Date vs. Paid to Date."* This spreadsheet stated that the total costs as of May 31, 2001 were $514,451.08, and the amounts paid by BBHI for subcontractor labor and materials on the Gadtkes' home as of May 31, 2001 totaled of $409,979.45.

In addition to this spreadsheet, on June 4, 2001, Schmidtlein faxed the Gadtkes

copies of ten mechanic's lien waivers signed by subcontractors in the total amount of $168,969.28, and two unsigned lien waivers in the total of $41,500. On June 6, 2001, Schmidtlein faxed the Gadtkes copies of three additional lien waivers signed by subcontractors totaling $40,561 for work done on the Gadtkes' home.[5] Following the receipt of this June 6, 2001 fax, the Gadtkes wrote a check to BBHI in the amount of $191,046 for the second progress payment, their third overall payment, due under the Building Agreement.

On July 3, 2001, the Gadtkes received a letter from Peter Allen Co., a subcontractor on their housing project, stating that the company would no longer be a subcontractor of BBHI, and would no longer work on their home project through BBHI. Peter Allen Co., however, expressed in the letter the desire to work with the Gadtkes directly to complete their home building project. David Gadtke contacted Peter Allen Co. to discuss this matter, and learned that BBHI had failed to pay certain subcontractors for work performed on his home and that many subcontractors' invoices were past due. Upon further inquiry, the Gadtkes learned that some subcontractors either filed or were threatening to file mechanic's liens against their home for unpaid invoices. One such subcontractor was Scott Builders.[6]

Upon learning this information, David Gadtke confronted Bren and Bren for the

---

4. Included in these mechanic's lien waivers was a waiver dated February 16, 2001 from Scott Builders, stating that they received payment from BBHI in the amount of $38,000. The Gadtkes later discovered, however, (and Scott Jerome later testified), that Bren instructed Scott Builders not to deposit the $38,000 check because BBHI's bank accounts lacked sufficient funds. In fact, many of the checks from BBHI included the stamped statement "Please call before depositing." Schmidtlein testified that this was done to

help manage cash flow-once a subcontractor received a check, BBHI requested that he call BBHI before depositing the check to make sure sufficient funds were in the BBHI bank accounts.

5. One of these lien waivers was signed by Scott Builders.

6. Scott Jerome of Scott Builders testified that although he had received a check in the amount of $40,000 from BBHI on or around

first time told Gadtke that BBHI had been experiencing financial difficulties, and he had been unable to pay subcontractors on a current basis. Bren asked the Gadtkes if they would agree to "work with him" to get through this difficult period. The Gadtkes agreed, and starting in September of 2001, David Gadtke initiated weekly meetings with Bren to discuss the progress of the Gadtke construction project and the status of BBHI's payments to subcontractors. During this time, construction on the Gadtkes' home slowed down, and finally on October 4, 2001, the Gadtkes received a letter stating that BBHI quit their project and would not perform any further work.[7] To date, the Gadtkes' payments to BBHI total $573,138, and the payments made by BBHI for labor and materials on their home total $380,711.10.

On December 3, 2001, the Brens filed for Chapter 7 bankruptcy. On January 14, 2002, BBHI's Minnesota residential building contractor's license was revoked by the Minnesota Commissioner of Commerce pursuant to a Consent Order. With a lot of time and effort, the Gadtkes negotiated with subcontractors and have managed to substantially complete their home, albeit at a cost in excess of the original contract price.

### THE GADTKE'S CLAIMS

The Gadtkes assert that Bren's debts to them are nondischargeable under 11

May 31, 2001, and had signed a lien waiver stating he had received payment, the check was not honored at that time because there were insufficient funds in BBHI's bank accounts. Jerome testified that during this time he had numerous conversations with Bren regarding the balances in BBHI's accounts, and that Bren instructed him to hold the check until there were sufficient funds in the accounts. Ultimately, Jerome returned the $40,000 check to BBHI in exchange for a $10,000 check. Jerome testified that he did

U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6). For the following reasons, I disagree.

### DISCUSSION

*Nondischargeability under 11 U.S.C. § 523(a)(2)(A)*

Section 523(a)(2)(A) provides that a discharge under 11 U.S.C. § 727 does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A) (2002). The Gadtkes claim that Bren committed fraud in this case in at least three ways: (1) falsely representing to the Gadtkes that their payments would be applied to fund the construction of their house and not to other uses; (2) causing BBHI to transmit false mechanic's lien waivers to the Gadtkes for the purpose of inducing them to make further payments to BBHI; and (3) failing to disclose to the Gadtkes the material facts of BBHI's insolvency.

▆▆▆ Normally, exceptions to discharge are narrowly construed against the creditor and liberally in favor of the debt-

not deposit this check either because Bren requested that Jerome bring the check back to BBHI due to lack of funds in BBHI's bank accounts.

7. In the summer and fall of 2001, the relationship between BBHI and the Gadtkes deteriorated. Bren complains that the Gadtkes failed to make agreed upon progress payments, but admitted that no more invoices were ever sent.

or, thus effectuating the fresh start policy of the Bankruptcy Code. *The Merchants of Nat'l Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (8th Cir. BAP 1999). Bankruptcy law, however, has long prohibited debtors from discharging liabilities incurred on account of their fraud. *Id.* For a debt to be excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(A), the creditor must prove the elements of fraud by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (establishing a preponderance of the evidence as an appropriate burden of proof under section 523); *Alport v. Ritter (In re Alport)*, 144 F.3d 1163, 1166 (8th Cir.1998). To establish fraud under 11 U.S.C. § 523(a)(2)(A), the plaintiffs must show: (1) the debtor made a representation; (2) at the time the representation was made the debtor knew it was false; (3) the debtor made the representation deliberately and intentionally with the intent and purpose to deceive the creditor; (4) the creditor justifiably relied upon such representation; and (5) the creditor sustained injury as a proximate result of the representation. *In re Moen*, 238 B.R. at 790; *Minn. Client Security Bd. v. Wyant (In re Wyant)*, 236 B.R. 684, 694 (Bankr. D.Minn.1999); *see In re Alport*, 144 F.3d at 1167.

■ To qualify as a false representation or false pretense under 11 U.S.C. § 523(a)(2)(A), the statement must relate to a present or past fact. *Shea v. Shea (In re Shea)*, 221 B.R. 491, 496 (Bankr.D.Minn. 1998). "[A debtor's] promise...related to [a] future action [which does] not purport to depict current or past fact...therefore

cannot be defined as a false representation or a false pretense." *Id.* (quoting *Bank of Louisiana v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991)). A debtor's promise related to a future act can constitute actionable fraud, however, where the debtor possesses no intent to perform the act at the time the debtor's promise is made. *Universal Pontiac–Buick–GMC Truck, Inc. (In re Routson)*, 160 B.R. 595, 609 (Bankr.D.Minn.1993).

### Verbal Misrepresentations

■ The Gadtkes claim that Bren lied verbally to them regarding how their payments would be used. Specifically, the Gadtkes state that starting in October of 2000, Bren repeatedly falsely represented to them that he would apply the payments they made to BBHI only to fund the construction of their home.[8] The Gadtkes claim that Bren knew such statements were false, yet intended to deceive or defraud them so that he could obtain more money from them to pay BBHI's debts.

First, while there is conflicting evidence on this issue, I find that Bren never told the Gadtkes that their payments would be used exclusively for their home. Bren testified that he did not tell the Gadtkes that he would use their payments exclusively for their home, and was candid in saying that during the twenty years he was in business, he never used funds from a particular project exclusively for that project. Finally, neither the Building Agreement, nor any other documents state that Bren would apply the payments made by the Gadtkes exclusively toward their home.

---

**8.** David Gadtke testified that during the time he and Bren negotiated the Building Agreement contract, Bren verbally stated to him that the first down payment and subsequent progress payments, made by the Gadtkes, would be used to pay for the building of their home, materials for their home, payments to the subcontractors working on their home, and that Bren would be paid at the end of the job. Gadtke also testified that Bren never suggested or disclosed that progress payments would be used in any other way.

 Even if I were to find that Bren told the Gadtkes that he would use their payments exclusively toward the construction of their home, the parol evidence rule would not allow such statements to be legally effective. Parol evidence is sometimes admitted to modify a written agreement. In Minnesota the parol evidence rule is a rule of *substantive law, not of evidence.*[9] *Telex Corp. v. Balch*, 382 F.2d 211, 215 n. 5 (8th Cir.1967) (emphasis added). The parol evidence rule makes inadmissible evidence concerning discussions prior to or contemporaneous with the execution of a written agreement when that evidence contradicts or varies the terms of the written agreement. *Material Movers, Inc. v. Hill*, 316 N.W.2d 13, 17 (Minn. 1982). Evidence of a subsequent oral agreement is not precluded by the rule. *Id.* Where the language used in a contract is plain and unambiguous, the meaning is to be ascertained from the writing alone, not from what was intended to be written. *Carl Bolander & Sons, Inc. v. United Stockyards Corp.*, 298 Minn. 428, 433, 215 N.W.2d 473, 476 (1974). Where it is apparent, however, that the written agreement is not a complete and final statement of the whole transaction between the parties parol evidence is admissible, not to vary the terms of the written agreement but to explain the intentions of the parties and language that is ambiguous or incomplete. *Material Movers, Inc.* 316 N.W.2d

at 17; *Flynn v. Sawyer*, 272 N.W.2d 904, 908 (Minn.1978). Moreover, parol evidence is admissible to help explain the parties' conduct subsequent to the written agreement. *Flynn*, 272 N.W.2d at 908. It is well settled in Minnesota that a written agreement may be modified by subsequent acts of the parties. *Mitchell v. Rende*, 225 Minn. 145, 150, 30 N.W.2d 27, 31 (1947) (citing *Dwyer v. Illinois Oil Co.*, 190 Minn. 616, 619, 252 N.W. 837, 838 (1934)); *In re R. Bastyr and Assoc., Inc.*, 81 B.R. 978, 982 (Bankr.D.Minn.1988). Parol modification must be proved by clear and convincing evidence rather than a mere preponderance of the evidence. *Merickel v. Erickson Stores Corp.*, 255 Minn. 12, 15, 95 N.W.2d 303, 305 (1959); *Hentges v. Schuttler*, 247 Minn. 380, 383, 77 N.W.2d 743, 746 (1956); *Kavanagh v. The Golden Rule*, 226 Minn. 510, 516, 33 N.W.2d 697, 700 (1948); *In re R. Bastyr and Assoc., Inc.*, 81 B.R. at 982. The purpose for imposing a higher standard of proof is to protect parties against fraudulent claims. *Hentges*, 247 Minn. at 383, 77 N.W.2d at 746.

Nothing in the Building Agreement required BBHI to use the Gadtkes' payments exclusively for their home's construction. I find that the use of parol evidence to modify the Building Agreement is not appropriate in this case.

9. As such, evidence of oral statements allegedly made by Bren to the Gadtkes can be heard by the trier of fact, but may later be deemed inappropriate for purposes of modifying the written contract between those parties. As the Eighth Circuit Court of Appeals noted:

Whether a particular subject of negotiation is embodied by the writing depends wholly upon the intent of the parties thereto...There is a preliminary question for the judge to decide as to the intent of the parties, and upon this he hears evidence on both sides...If he decides that the transac-

tion was covered by the writing, he does not decide that the excluded negotiations did not take place, but merely that if they did take place, they are nevertheless legally immaterial. If he decides that the transaction was not intended to be covered by the writing, he does not decide that the negotiations did take place, but merely that if they did, they are legally effective, and he then leaves to the jury the determination of fact whether they did take place.

*Telex Corp.*, 382 F.2d at 216 n. 6 (quoting IX Wigmore, Evidence, 3rd ed., § 2430, pp. 97–99).

David Gadtke testified that Bren made verbal assertions that he would apply the Gadtkes' payments exclusively to their home, and that such statements were made during negotiations of the Building Agreement. As such, these alleged statements would have been made prior to or contemporaneous with the written agreement. I find that if such statements were deemed legally effective, they would vary the terms of the contract, which is precluded by the parol evidence rule. Moreover, I find that it has not been proven that the written agreement *was not* the complete and final statement of the whole transaction between the parties. Nor do I find that the language in the Building Agreement is ambiguous or incomplete. For purposes of parol modification, I find that the Gadtkes have not proven by clear and convincing evidence that Bren's verbal statements, made during negotiations of the Building Agreement, should be allowed to modify the written agreement.

■ Finally, even if I were to find that the first three elements of the Gadtkes' fraud claim under 11 U.S.C. 523(a)(2)(A) were met, the Gadtkes still must, by a preponderance of the evidence, prove the fourth-element: that they relied on the verbal misrepresentations of Bren and that such reliance was justified. Mere reliance upon a false representation does not in and of itself channel the inquiry into the damage element of fraudulent misrepresentation. *Johnson Building Co. v. River Bluff Development Co.*, 374 N.W.2d 187, 193 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. Nov. 18, 1985). The Gadtkes had no right to withhold progress payments from Bren because under the Building Agreement, once certain items were installed in or on their home, payments from the Gadtkes to BBHI became due and payable. I find that the Gadtkes did not

rely on the misrepresentations of Bren for the purpose of making payments to BBHI, since they were already obligated to make payments by contract. "Claimed reliance that is without right, that is unreasonable, or that is unjustified, is in reality *not reliance at all* since those elements are inherent to the concept of reliance itself." *Facility Planning, Inc. v. King (In re King)*, 68 B.R. 569, 572 n. 7 (Bankr. D.Minn.1986) (emphasis added).

### Mechanic's Lien Waivers

■ Additionally, the Gadtkes claim that Bren committed fraud under 11 U.S.C. § 523(a)(2)(A) by transmitting false mechanic's lien waivers to them for the purpose of fraudulently inducing them to make further payments to BBHI. It is undisputed that Bren repeatedly required subcontractors to submit a mechanic's lien waiver before dispersing their payment, and often upon tendering the checks to the subcontractors, Bren would require they wait before depositing the checks to make sure the BBHI bank accounts contained sufficient sums.[10] This caused the Gadtkes to receive lien waivers which stated that the subcontractors who signed them received payment, when in fact the checks many subcontractors received were returned to BBHI due to insufficient funds. I find that the Gadtkes, however, do not prove that Bren allowed such waivers to be faxed to them *with the intent* to deceive or defraud.

■ " 'A false pretense involves implied misrepresentation or conduct intended to create and foster a false impression.' " *In re Moen*, 238 B.R. at 791 (quoting *Leeb v. Guy (In re Guy)*, 101 B.R. 961, 978 (Bankr.N.D.Ind.1988)). For purposes of 11 U.S.C. § 523(a)(2)(A), a misrepresentation denotes " 'not only

10. See footnote 4.

words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth.' " *Id.* (quoting *La Capitol Fed. Credit Union v. Melancon (In re Melancon),* 223 B.R. 300, 308–309 (Bankr.M.D.La.1998)). " 'In assessing a debtor's knowledge of the falsity of the representation, the court must consider the knowledge and experience of the debtor.' " *Id.* (quoting *Fed. Trade Comm'n v. Duggan (In re Duggan),* 169 B.R. 318, 324 (Bankr.E.D.N.Y.1994)). " 'A false representation made under circumstances where a debtor should have known of the falsity is one made in reckless disregard for the truth, and satisfies this knowledge requirement.' " *Id.*

■ The intent element of 11 U.S.C. § 523(a)(2)(A) requires a showing of intent to induce the creditor to rely and act on the misrepresentations in question. *Moodie–Yannotti v. Swan (In re Swan),* 156 B.R. 618, 623 n. 6 (Bankr.D.Minn.1993) (citing *Jennen v. Hunter (In re Hunter),* 771 F.2d 1126, 1129 (8th Cir.1985)). Because direct proof of intent (i.e. the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred. *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1287 (8th Cir.1987). "Intent to deceive will be inferred where a debtor makes a false representation and the debtor knows or should know that the statement will induce another to act." *In re Moen,* 238 B.R. at 791 (quoting *Fed. Trade Comm'n v. Duggan (In re Duggan),* 169 B.R. 318, 324 (Bankr.E.D.N.Y.1994)).

Bren would clearly have known that the Gadtkes relied on the waiver of the liens, since the Gadtkes had the statutory right to pay the subcontractors directly if they did not receive such a waiver. Yet because the Gadtkes received mechanic's lien waivers, they had no contractual or statutory right to withhold further payments from BBHI simply because subcontractors had not been paid, and similarly had no obligation to pay subcontractors directly. Recital of payment, therefore, is an issue between Bren and the subcontractors not between Bren and the Gadtkes.

Moreover, to be fraud, at the time he requested each subcontractor to sign a mechanic's lien waiver in exchange for payment in the form of a check, Bren would either have to know or intend that the particular subcontractor's check would ultimately not be honored. Yet this is not supported by the evidence or the testimony. Bren testified, as did subcontractor Scott Jerome, that although Bren generally required the subcontractors to wait before depositing checks from BBHI, (sometimes as long as a month), to make sure adequate funds were in the BBHI bank accounts, BBHI usually made good on the checks and they were eventually honored by the bank.[11] Furthermore, Bren testified that some of the Gadtke subcontractors' past due invoices were paid from his personal funds, in order to make good the checks BBHI tendered to those subcontractors in past weeks. I cannot find that at the time the lien waivers were faxed to the Gadtkes, Bren did not intend to deposit sufficient funds into his bank accounts so that subcontractors' returned checks could ultimately be honored. Therefore, I find that it has also not been proven that Bren knew or should have known that the representations stating that certain subcontrac-

---

11. Jerome testified that he was not concerned initially when one of the checks he received from BBHI for the Gadtke project was returned due to insufficient funds because, based on past experiences with BBHI, he believed that eventually BBHI would make good on the check.

tors had in fact been paid would ultimately turn out false.

Even if Bren knew or should have known that some of the faxed lien waivers were false, I find that Bren did not intend to fraudulently induce the Gadtkes into paying more money to BBHI based on those waivers. First, the principal point of mechanic's lien waivers (as their title indicates) is to waive any right to assert a mechanic's lien. This is intended to protect the homeowner or a lender from liens being filed on their property. The purpose of lien waivers for property owners is not necessarily to prove payment. Moreover, the purpose of signed lien waivers is accomplished whether or not there is actual payment. *See McLellan v. Hamernick,* 264 Minn. 345, 348–349, 118 N.W.2d 791, 794 (1962) (stating that the subcontractors executed unambiguous waivers of their liens, and the mere fact that the general contractor failed to pay his subcontractors cannot deprive the homeowner of his right to rely on the validity of the waivers). To the extent the subcontractors had not been paid, I find that Bren intended to pay them so there was no intent on his part to mislead the Gadtkes.

Since the Gadtkes' argument concerns the alleged fraud of Bren in *obtaining* their money, the focus of 11 U.S.C. § 523(a)(2)(A) should be on Bren's subjective good faith intent to ultimately pay the obligations to subcontractors and complete the Gadtkes' project at the time the waivers were faxed, not whether Bren converted or otherwise misused the funds he received from the residence project. The latter should be analyzed under 11 U.S.C. §§ 523(a)(4) and (a)(6). *See Dutreix v. Fontenot (In re Fontenot),* 89 B.R. 575, 580 (Bankr.W.D.La.1988).

I find that Bren's testimony as well as the testimony of Scott Jerome is consistent with Bren's good faith intention to fulfill his obligations regarding subcontractors' payments. Bren's failure to pay some of the subcontractors who worked on the Gadtke project at the time he was paid by the Gadtkes, does not preclude the valid intention to pay them subsequently. While it is apparently true that Bren used the progress payments from the Gadtkes to pay subcontractors on other jobs, and I assume he also used payments from other jobs to make payments to the Gadtke subcontractors, this fact does not preclude the subjective good-faith intent of Bren to ultimately pay the subcontractors on the Gadtkes' project so that work on their project could continue.

Moreover, when Schmidtlein faxed the first and second groups of lien waivers to the Gadtkes, the roof framing and installation of the windows was complete, thus causing the first and second progress payments to be due under the Building Agreement. Bren did not have to use the lien waivers to induce the Gadtkes to pay progress payments because such sums were already due and payable to the contractor, BBHI, according to the *terms in the Building Agreement.* The Gadtkes did not have the right to withhold due payments based on accountings from BBHI or mechanic's lien waivers because this was not incorporated into the Building Agreement. The valid Building Agreement governed BBHI's right to payment, not the lien waivers. Thus it is doubtful that Bren intended to defraud the Gadtkes based on such waivers. While Minnesota law gives land owners the right to withhold payment until they receive mechanic's lien waivers, the Gadtkes received what they were entitled to: waiver of lien rights.

Finally, even if there were an intent to deceive the Gadtkes based on the mechanic's lien waivers, the Gadtkes still must prove by a preponderance of the evidence that they *justifiably* relied on the misrep-

resentations within the waivers. Mere reliance upon a false representation does not in and of itself channel the inquiry into the damage element of fraudulent misrepresentation. *Johnson Building Co. v. River Bluff Development Co.*, 374 N.W.2d 187, 193 (Minn.Ct.App.1985), *pet. for rev. denied*, (Minn. Nov. 18, 1985). As stated previously, the Gadtkes had no right to withhold progress payments from Bren based on mechanic's lien waivers because under the Building Agreement, once certain items were installed in or on their home, progress payments from them became due and payable to BBHI. Moreover, although many of the lien waivers stated that certain subcontractors had received payment, none of them stated if payments in the form of checks were ultimately honored. I find that the Gadtkes did not rely on the truth or falsity of the lien waivers to pay progress payments, because this was not made part of the written contract between the parties.

*Failure to Disclose Financial Condition*

Finally, the Gadtkes allege that Bren committed fraud by failing to disclose BBHI's insolvency. The Gadtkes claim that this fact was material to them and had they known this, they would have taken steps to protect themselves. The Gadtkes further state that Bren concealed this fact to fraudulently induce them to pay him additional money with which he could try to save his business.

■■■■ "Fraud can be based on any type of conduct calculated to convey a misleading impression." *In re Wyant*, 236 B.R. at 695 (quoting *AT & T Universal Card Serv. v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326, 333 (Bankr.W.D.Mo. 1997)). "Thus it is not relevant whether the representation is expressed or implied." *Id.* Accordingly, silence or the concealment of a material fact can be the basis of a false representation actionable under 11 U.S.C. § 523(a)(2)(A). *Id.*

■■ First, if there was an impression representing that BBHI was enjoying financial prosperity, that would be an unwritten statement of the debtor's financial condition, and therefore expressly excluded as a basis for fraud under § 523(a)(2)(A). *In re Wyant*, 236 B.R. at 697. Section 523(a)(2)(A) states that a discharge under section 727 "does not discharge an individual debtor from any debt...to the extent obtained by false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's or an insider's financial condition.*" 11 U.S.C. § 523(a)(2)(A) (2002) (emphasis added). Similarly, Bren's failure to disclose his precarious financial situation is at best an implied state of his financial condition and excluded from the purview of § 523(a)(2)(A).

■■ Furthermore, mere concealment of his financial position is not enough under 11 U.S.C. § 523(a)(2)(A). The Gadtkes must also prove that Bren lacked intent to perform under the contract when he accepted the plaintiffs' money, i.e. that Bren knew at the time he took the Gadtkes' money that BBHI was in so much financial trouble it would not or could not complete their project for the price agreed upon, yet took the Gadtkes' money despite such knowledge. I find that this has not been proven. *See In re Wyant*, 236 B.R. at 698 (stating that the evidence of the defendant's awareness of his firm's financial weakness is insufficient to find that he actually knew that the firm was doomed to financial failure and that clients would necessarily suffer financial losses).

*Nondischargeability under
11 U.S.C. § 523(a)(4)*

Section 523 (a)(4) of the Bankruptcy Code provides:

(a) A discharge under section 727...of this title does not discharge an individual debtor from any debt-

(4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

11 U.S.C. § 523(a)(4) (2002).

### Fiduciary Capacity

The Gadtkes first argue that Bren committed fraud or defalcation while acting in a fiduciary capacity that was established by a trust created in Minn.Stat. § 514.02. Subdivision 1(a) of that statutory provision states:

> Proceeds of payments received by a person contributing to an improvement to real estate within the meaning of section 514. 01 shall be held in trust by that person for the benefit of those persons who furnished the labor, skill, material or machinery contributing to the improvement. Proceeds of the payment are not subject to garnishment, execution, levy, or attachment. Nothing contained in this subdivision shall require money to be placed in a separate account and not commingled with other money of the person receiving payment or create a fiduciary liability or tort liability on the part of any person receiving payment or entitle any person to an award of punitive damages among persons contributing to an improvement of real estate under section 514.01 for a violation of this subdivision.

Minn.Stat. § 514.02 (2002). The Gadtkes argue that pursuant to the language of subdivision 1(a), Bren was (1) obligated to use the proceeds he received from the Gadtkes exclusively towards the construction of their home; (2) by using some of the Gadtke funds to pay the general debts of BBHI rather than the subcontractors of their home, Bren violated Minn.Stat.

§ 514.02; and (3) committed both fraud and defalcation in his fiduciary capacity.

It has long been the law that the "fiduciary" status in question under 11 U.S.C. § 523(a)(4) must arise under an express, pre-existing trust. *Jafarpour v. Shahrokhi (In re Shahrokhi)*, 266 B.R. 702, 707 (8th Cir. BAP 2001). The Bankruptcy Code does not reach constructive trustees designated as such because of misconduct. *Tudor Oaks Ltd. P'ship v. Cochrane (In re Cochrane)*, 124 F.3d 978, 984 (8th Cir.1997); *Barclays Am. Bus. Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 878 (8th Cir.1985). Thus, the fiduciary relationship must have been created before the acts complained of. *In re Cochrane*, 124 F.3d at 984.

Moreover, "'whether a relationship is a fiduciary one within the meaning of 11 U.S.C. § 523(a)(4) is a question of federal law.'" *Id.* (quoting *Lewis v. Scott*, 97 F.3d 1182, 1185 (9th Cir.1996)); *MacArthur Co. v. Crea (In re Crea)*, 31 B.R. 239, 244 (Bankr.D.Minn.1983) (stating that the meaning of "fiduciary" in § 523 is an issue of federal law and that state law is recognized only to the extent it applies a similar definition of trust and fiduciary duty); *see also In re Long*, 774 F.2d at 878 (stating that under limited circumstances state law may create the requisite fiduciary relationship). *Long* recognized that a state law may create a fiduciary status in a corporate officer within bankruptcy proceedings, however, the state law classification is not conclusive. *United American Ins. Co. v. Koelfgen (In re Koelfgen)*, 87 B.R. 993, 996 (Bankr.D.Minn.1988). The concept of "fiduciary capacity" is limited to express or technical trusts, not those implied by law. *Id.; In re Long*, 774 F.2d at 878 (stating that it has long been established that the Bankruptcy Act reference to "fiduciaries" applies to trustees of express trusts); *In re Crea*, 31 B.R. at 244.

Express or technical trust are formed by direct and positive acts of both parties manifested by some instrument in writing, whether by deed, will, or otherwise. *Morgan v. American Fidelity Fire Ins. Co.,* 210 F.2d 53, 55–56 (8th Cir.1954). Courts look at the contract between the parties to determine the existence of a fiduciary relationship. *In re Koelfgen,* 87 B.R. at 996. Under Minnesota common law, the essentials of an express trust relationship are (1) a designated trustee subject to enforceable duties; (2) a designated beneficiary vested with enforceable rights; and (3) a definite trust res wherein the trustee's title and estate is separated from the vested beneficial interests of the beneficiary. *Bush v. Crowther (In re Bush's Trust),* 249 Minn. 36, 43, 81 N.W.2d 615, 620 (1957); *Drewes v. Schonteich,* 31 F.3d 674, 677 (8th Cir.1994). A trust is created when the *intention* is that the monies shall be kept or used as a separate fund for the benefit of the payor or a third person. *American Surety Co. of New York v. Greenwald,* 223 Minn. 37, 44, 25 N.W.2d 681, 685 (1946) (emphasis added). Whereas a debt is created when the intention is that the person receiving the monies shall have unrestricted use thereof, being liable to pay similar accounts whether with or without interest to the payor or a third party. *Id.*

The Gadtkes argue that the fiduciary requirement of 11 U.S.C. § 523(a)(4) is satisfied by Minn.Stat. § 514.02, because that provision creates an express trust at the moment the contractor receives funds from the homeowner. First, I find that if a trust is created by the statute, it is not an express or technical trust, but one implied by law. Statutory trusts are neither express nor technical trusts. *Mo–Kan Iron Workers Pension Fund v. Engleman (In re Engleman),* 271 B.R. 366, 370 (Bankr.W.D.Mo.2001). " 'A

statute alone cannot, in the absence of the parties' express intention, create an express or technical trust.' " *Id.* (quoting *Spinoso v. Heilman (In re Heilman),* 241 B.R. 137, 162 (Bankr.D.Md.1999)). The concept of "fiduciary capacity" for purposes of § 523(a)(4), however, is limited to an express or technical trust. *In re Koelfgen,* 87 B.R. at 996; *In re Crea,* 31 B.R. at 244; *see also In re Long,* 774 F.2d at 878 (stating that it has long been established that the Bankruptcy Act reference to "fiduciaries" applies to trustees of express trusts). Moreover, there is nothing in the Building Agreement which would indicate the intent to create an express or technical trust. The substance of that agreement created a debtor/creditor relationship. Under the contract Bren was not required to segregate the Gadtkes' money or to hold them in trust.

Secondly, even if the Minnesota statute does create a fiduciary relationship that satisfies the fiduciary requirement of 11 U.S.C. § 523(a)(4), the fiduciary relationship is between the contractor and his *subcontractors,* not between the contractor and his client. Minnesota statute § 514.02 subdivision 1(a) specifically states that "Proceeds of payments received by a person contributing to an improvement to real estate within the meaning of section 514.01 shall be held in trust by that person *for the benefit of those persons who furnish the labor, skill, material, or machinery contributing to the improvement.*" Minn.Stat. § 514.02 (2002) (emphasis added). The provision that is pertinent to the *client* of the contractor is in section 514.02 subdivision 1(b), and states:

> If a person fails to use the proceeds of a payment made to that person for the improvement, for the payment for labor, skill, material, and machinery contributed to the improvement, knowing that the cost of the labor performed, or skill,

material, or machinery furnished remains unpaid, *and who has not furnished the person making such payment either a valid lien waiver under section 514.07, or payment of bond* in the basic amount of the contract price for the improvement, conditioned for the prompt payment to any person entitled thereto for the performance of labor or the furnishing of skill, material, or machinery for the improvement, shall be guilty of theft of the proceeds of the payment and is punishable under section 609.52.

Minn.Stat. § 514.02 (2002) (emphasis added). This section does not even purport to create a fiduciary relationship between a contractor and his client, but rather provides criminal penalties for failing to provide lien waivers. Bren, however, provided the Gadtkes signed lien waivers.

### *Embezzlement*

▮▮▮ The Gadtkes also argue that Bren's conduct constitutes embezzlement within the meaning of 11 U.S.C. § 523(a)(4). Embezzlement can be proven under § 523(a)(4) without the plaintiffs having to prove that the defendant was acting in a fiduciary capacity. *See In re Beasley*, 62 B.R. 653, 654 (Bankr.W.D.Mo. 1986). Embezzlement for purposes of 11 U.S.C. § 523(a)(4) is defined as the " 'fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' " *Belfry v. Cardozo (In re Belfry)*, 862 F.2d 661, 662 (8th Cir.1988) (quoting *Teamsters Local 533 v. Schultz (In re Schultz)*, 46 B.R. 880, 889 (Bankr. D.Nev.1985)). The embezzlement exception requires that the debtor use the creditor's property before complying with some obligation to the creditor. *Id.* at 662. The Gadtkes must prove that Bren was not lawfully entitled to use their funds for the purpose which it was used.

▮▮▮ In this case, I find that the Gadtkes have not proven embezzlement. Bren had the right to payments under the contract once certain items were installed in or on the Gadtkes' property. Payment of a contract price in exchange for the recipient to undertake an obligation of future performance transfers the ownership of the money to the recipient. *In re Belfry*, 862 F.2d at 662; *see In re Schultz*, 46 B.R. at 889–890. One cannot embezzle one's own property. *Id.* Moreover, under the contract, there was no requirement that Bren segregate the money received from the Gadtkes, nor was there a requirement that the funds be used exclusively for their home. I find that if there was a remaining property interest in the money Bren received from the Gadtkes, the subcontractors, not the Gadtkes, may have a right to such funds pursuant to Minn.Stat. § 514.02 and applicable bankruptcy law. Thus, even if there was an embezzlement, it would have been embezzlement of the subcontractors' money, not the Gadtkes'.

### *Nondischargeability under 11 U.S.C. § 523(a)(6)*

▮▮▮ The Gadtkes argue that Bren's debt to them is nondischargeable under 11 U.S.C. § 523(a)(6). A discharge under section 727 of the Bankruptcy Code does not discharge an individual debtor from "any debt...for willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6) (2002). Willful and malicious are two distinct requirements that the plaintiffs, the party seeking to avoid the discharge of the debt, must prove by a preponderance of the evidence before the § 523(a)(6) exception to discharge applies. *Fischer v. Scarborough (In re Scarborough)*, 171 F.3d 638, 641 (8th Cir.1999). In the Eighth Circuit, case law interpreting

the meaning of "willful" and "malicious" in 11 U.S.C. § 523(a)(6), as modified by *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998), is well developed. For purposes of 11 U.S.C. § 523(a)(6), the term willful means deliberate or intentional. *Kawaauhau*, 523 U.S. at 61, 118 S.Ct. at 977 (stating that 11 U.S.C. § 523(a)(6) requires deliberate or intentional injury); *Johnson v. Fors (In re Fors)*, 259 B.R. 131 136 (8th Cir. BAP 2001). In *Kawaauhau*, the United States Supreme Court addressed the meaning of the word "willful" in 11 U.S.C. § 523(a)(6) and stated:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate, intentional injury, not merely a deliberate or intentional act that leads to injury...Moreover, as the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require the actor "intend the *consequences of an act*," not simply "*the act itself.*" Restatement (Second) of Torts § 8(a), Comment a, p. 15 (1964) (emphasis added).

*Kawaauhau*, 523 U.S. at 61–62, 118 S.Ct. at 977; *see also Barclays American/Business Credit, Inc. v. Long (In re Long)*, 774 F.2d 875, 881 (8th Cir.1985) (stating that the plaintiffs must prove that the debtor's actions were headstrong and knowing to meet the wilfulness component of § 523(a)(6)).

■■■■ The word "malicious" in 11 U.S.C. § 523(a)(6) is defined as conduct targeted at the creditor at least in the sense that the conduct is certain or almost certain to cause harm. *Johnson v. Miera (In re Miera)*, 926 F.2d 741, 743–744 (8th Cir.1991); *In re Long*, 774 F.2d at 880–881. Maliciousness is a separate requirement from willfulness. *Id.* In sum, the creditor must prove under § 523(a)(6) that the debtor intended both the injury [12] and the harm. [13] *Siemer v. Nangle (In re Nangle)*, 257 B.R. 276, 283 (8th Cir. BAP 2001); *Allstate Ins. v. Dziuk (In re Dziuk)*, 218 B.R. 485, 487 (Bankr.D.Minn.1998).

■■■■ The Gadtkes argue that Bren's conduct amounts to a willful and malicious *conversion* of their property, because Bren procured their funds under the pretense of applying them toward the construction of the Gadtkes home, yet knowingly and willfully misapplied those funds to pay general debts of BBHI. As I found earlier, once the Gadtkes paid Bren the payments due under the contract, that money no longer belonged to them but became Bren's property. *See In re Belfry*, 862 F.2d at 662. A person cannot convert his own property.

For the Gadtkes to prevail on the § 523(a)(6) claim, they must demonstrate that they suffered an injury as a result of an intentional tort by Bren (i.e. that Bren's actions were willful) and that Bren's conduct was targeted at the Gadtkes (i.e. Bren's conduct was also malicious). I find that Bren did not intend to injure or harm the Gadtkes. It is obvious both from testimony and his actions that Bren had every intention of paying subcontractors and performing under the contract. In hindsight, one may characterize Bren's actions as negligent but his actions were not intentional. I also find that Bren did not act with maliciousness in that his actions were not targeted to cause harm to the Gadtkes.

---

12. "The invasion of any legally protected interest of another." Restatement (Second) of Torts § 7(1).

13. "The existence of loss or detriment in fact of any kind to a person resulting from any case." Restatement (Second) of Torts § 7(2).

## CONCLUSION

The plaintiffs have failed to prove that the defendant's debts to them should be excepted from discharge under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) or (a)(6).

## ORDER

THEREFORE, IT IS ORDERED that:

The defendant's debt to the plaintiffs is not excepted from his discharge.

LET JUDGMENT BE ENTERED ACCORDINGLY.