# United States Court of Appeals

### For the Eighth Circuit

_____

No. 14-3190

_____

In re: WEB2B Payment Solutions, Inc.

*Debtor*

------------------------------

Rent-A-Center East, Inc.

*Appellant*

v.

Brian F. Leonard, Trustee

*Appellee*

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: November 18, 2015
Filed: March 4, 2016

_____

Before SMITH, BYE, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

WEB2B Payment Solutions, Inc. provided automated clearinghouse and electronic-check conversion services to Rent-A-Center East, Inc. ("RAC"). In 2011, WEB2B filed for bankruptcy. North American Bank turned over WEB2B's balances to the Chapter 7 trustee, Brian F. Leonard. RAC filed a complaint, claiming $801,378.76 of the balances as an express trust, resulting trust, or constructive trust. The Bankruptcy Court dismissed RAC's claims, granting summary judgment to the Trustee. The District Court[1] affirmed. RAC appeals. Having jurisdiction under 28 U.S.C. § 158(d)(1), this court affirms.

## I.

RAC's primary business is renting furniture and appliances. For check-processing, RAC made a Processing Client Agreement with WEB2B in March 2007. For about 100 customers, including RAC, WEB2B provided automated clearinghouse, electronic-check conversion, credit verification, and credit-card services.

The Processing Agreement prescribed how checks are processed: WEB2B "has contracted with a financial institution where [WEB2B] maintains an account on behalf of third parties such as [RAC] to accept electronic credit and debit entries for [RAC]." WEB2B permitted RAC "to initiate electronic signals for paperless credit and debit entries *through the Processor* [WEB2B] to accounts maintained by [RAC] at one or more Originating Depository Financial Institutions (ODFIs) and in other banks and financial institutions, *by means of* the Automated Clearing House (ACH) or other applicable check and funds transfer clearing systems." (Emphasis added). In an exhibit to the Agreement, WEB2B agreed to "initiate debit and/or credit entries to [RAC's] Checking Account indicated below at the depository financial institution

---

[1]The Honorable David S. Doty, United States District Judge for the District of Minnesota.

. . . and to debit and/or credit the same to such an account." This checking account was at Intrust Bank, RAC's bank.

Before reaching Intrust's checking account, WEB2B processed RAC's checks by ACH or Check 21. In ACH, an originator converts a check to a text file for transmission by an ODFI to an automated clearinghouse, which transmits the entries to a receiving depository financial institution. Check 21, an imaging system, allows financial institutions to clear checks electronically without pre-existing agreements between the bank of first deposit and the paying bank.

For both processes, RAC's customers wrote checks payable to RAC or endorsed checks to RAC. RAC then transmitted electronic images of the checks to WEB2B (or converted them to ACH text files). Each day, WEB2B combined the check images from its customers, including RAC, into one file that WEB2B transferred to its secure website. North American Bank—WEB2B's bank—downloaded the check file and credited a single daily deposit to WEB2B's account 5165 at the Bank. North American Bank then sent check images to the Federal Reserve for overnight clearing. After the checks cleared, WEB2B made a single transfer for its customers from the 5165 account to WEB2B's account 4548. Finally, WEB2B made deposits to RAC's account at Intrust Bank. From March 2007 to December 2010, WEB2B followed these steps in processing RAC's checks, usually taking one to two days for each day's transactions.

In December 2010, RAC noticed that payments to its Intrust account were delayed. WEB2B had begun transferring funds from its account 4548 into yet another account (5173). WEB2B used the 5173 account to pay other customers and its operational expenses, while misleading RAC about the delayed deposits. On February 9, 2011, WEB2B made its last deposit to RAC's Intrust account. Between November 30, 2010, and February 28, 2011, WEB2B processed $11,880,076.91 of

-3-

RAC's checks. WEB2B remitted only $9,451,854.44 to RAC's Intrust account—leaving a $2.4 million shortage.

On April 4, 2011, WEB2B filed for bankruptcy. RAC claimed WEB2B owed it $2,454,749.39. Creditors, including RAC, filed proofs of claim for $3,757,197.67. North American Bank gave the Trustee $833,120.46 from WEB2B's accounts, including $719,480.78 from the 5173 account.

Before bankruptcy, RAC did not know how WEB2B processed its checks. Clarence O. Wheeler IV, RAC's designated agent for knowledge of check processing, testified he had no interaction with North American Bank and did not know about WEB2B's accounts there. He stated that "we had no reason to be intimately involved or knowledgeable about how they did—how they ran their business . . . . we were obviously concerned that we get our money, but we did—because we got our money to the penny we never dove into the process by which we got that money." Wheeler admitted that "all [he] knew and all RAC knew was that [WEB2B] would turn those funds around at some point in time and remit to RAC's bank accounts in Intrust Bank."

RAC filed a complaint seeking: a declaratory judgment that $801,378.76 in the Trustee's possession were RAC's funds, a determination that an express or resulting trust existed, or the imposition of a post-petition constructive trust. The Bankruptcy Court denied RAC's claim. RAC appealed to the District Court, which remanded the case to the Bankruptcy Court. In a Restated Order, the Bankruptcy Court ruled: (1) all proceeds from the North American Bank account were bankruptcy-estate property under 11 U.S.C. § 541(a), (2) no express or resulting trust was created, (3) a post-petition imposition of a constructive trust was not warranted, and (4) whatever equitable interests RAC had could be avoided by the Trustee's strong-arm powers. The District Court agreed.

II.

"When a bankruptcy court's judgment is appealed to the district court, the district court acts as an appellate court and reviews the bankruptcy court's legal determinations de novo and findings of fact for clear error. As the second court of appellate review, we conduct an independent review of the bankruptcy court's judgment applying the same standards of review as the district court." *In re Falcon Prods., Inc.*, 497 F.3d 838, 840-41 (8th Cir. 2007). This court reviews a grant of summary judgment de novo and "may affirm on any basis supported by the record." *Hemmingsen v. Messerli & Kramer, P.A.*, 674 F.3d 814, 816 (8th Cir. 2012). Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." **Fed. R. Civ. Pro. 56(a)**. A court must view the evidence "in the light most favorable to the nonmoving party." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002).

Generally, the bankruptcy estate is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case." **11 U.S.C. § 541(a)(1)**. "The nature and extent of the debtor's interest in property are determined by state law." *In re N.S. Garrott & Sons*, 772 F.2d 462, 466 (8th Cir. 1985). Once property rights are determined, "federal bankruptcy law dictates to what extent that interest is property of the estate." *Id.* "Congress plainly excluded property of others held by the debtor in trust at the time of the filing of the petition." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 205 n.10 (1983).

A.

RAC argues that the Processing Agreement established an express trust. Both parties agree that Minnesota law applies.

An express trust requires: "(1) a designated trustee subject to enforceable duties, (2) a designated beneficiary vested with enforceable rights, and (3) a definite trust res wherein the trustee's title and estate is separated from the vested beneficial interest of the beneficiary." *In re Bush's Trust*, 81 N.W.2d 615, 620 (Minn. 1957). "A trust is created only if the settlor demonstrates, by external expression, the intent to create a trust." *Bond v. Comm'r of Revenue*, 691 N.W.2d 831, 837 (Minn. 2005). No "particular form or words" are required to create a trust; however, "the settlor must show 'a definite, unequivocal, explicit declaration of trust.'" *Id.* "Express or technical trusts are formed by direct and positive acts of both parties manifested by some instrument in writing." *In re Bren*, 284 B.R. 681, 697 (Bankr. D. Minn. 2002).

The Processing Agreement shows that no express trust existed. The Agreement says that WEB2B is "acting in the capacity of an automated clearing house facilitator providing and facilitating electronic credit and debit entries on behalf of [RAC]." The words "on behalf of" sometimes appear in trusts. *See Mahoney, Hagberg & Rice v. Underwriting Serv. of N. Am.*, 1997 WL 666066, \*2 (Minn. Ct. App. Oct. 28, 1997) (finding a trust when the contract stated, "The premium account shall be a fiduciary account held in a bank . . . . This Account shall be used for all payments on behalf of Gerber."). The Agreement, however, explains that WEB2B "has contracted with a financial institution where [WEB2B] maintains *an account* on behalf of *third parties* such as [RAC] to accept electronic credit and debit entries for [RAC]." (Emphasis added). The "account"—used to process the checks—was WEB2B's North American Bank account, which was used for other clients, not just RAC. By the terms of the Agreement, RAC consented to commingling its funds with those of WEB2B's other clients in one account. Where "the depositor of cash consents to commingling it with other funds of the depositee, the relationship resulting from the transaction is not that of trustee and beneficiary . . . but that of debtor and creditor." *In re LGI Energy Solutions, Inc.*, 460 B.R. 720, 729 (B.A.P. 8th Cir. 2011) (applying Minnesota law). *See also Farmers State Bank of Fosston v. Sig Ellingson & Co.*, 16 N.W.2d 319, 323 (Minn. 1944) ("Where money paid to another is not

required to be segregated by the payee and held as a separate fund for the benefit of the payor, there is no trust.").

RAC argues the Agreement did not permit commingling, asserting that funds were to be processed directly to RAC's Intrust account. By the Agreement, RAC requested WEB2B to "permit [RAC] to initiate electronic signals for paperless credit and debt entries through the processor [WEB2B] to accounts *maintained by [RAC] at one or more [ODFIs]*." (Emphasis added). RAC emphasizes this language, concluding it had no reason to believe that its funds would ever travel through an account maintained by WEB2B. This conclusion is directly rebutted by the Agreement, which states that "[WEB2B] maintains an account on behalf of third parties such as [RAC] to accept electronic credit and debit entries for [RAC]." This language shows that RAC's funds would not only travel through a WEB2B account, but also be commingled with other customers' funds.

True, commingling of funds is not determinative; many common trust funds regularly pool assets. *See **Third Nat'l Bank of St. Paul v. Stillwater Gas Co.***, 30 N.W. 440, 441 (Minn. 1886) ("The depositing of trust money in a bank . . . does not change its character, or relieve the deposit from the trust. It is not the identity of the form, but the substantial identity of the fund itself"); *cf.* **Minn. Stat. § 48A.07(g)** (stating "a bank or trust company may: (1) establish and maintain common trust funds for the collective investment of funds held in a fiduciary capacity"). Unlike common trust funds, the Agreement provides for a debtor-creditor relationship for processing checks. "If one person pays money to another, it depends upon the manifested intention of the parties whether a trust or debt is created." ***Am. Surety Co. of New York v. Greenwald***, 25 N.W.2d 681, 685 (Minn. 1946) (finding an express trust where the writing clearly established a trust relationship—though it did not state the word "trust," explaining express trusts are "created by the parties in language directly and expressly pointing out the persons, property, and purposes of the trust."). *See also **Central Nat'l Bank v. Connecticut Mut. Life Ins. Co.***, 104 U.S. 54, 70-71

(1881) (finding a trust relationship where one party was not only a fiduciary and agent "but was acting in respect to . . . all the money he collected while such agent, under specific directions as to what he should do with it").

The debtor-creditor relationship here is like the relationship in *In re Bren*, where a family alleged that a contractor was "obligated to use the proceeds he received from [the family] exclusively towards the construction of their home." ***In re Bren***, 284 B.R. at 696. The court considered whether the written agreement established an express trust, which would have fiduciary status in bankruptcy. ***Id.*** The court concluded there was "nothing in the Building Agreement which would indicate the intent to create an express or technical trust. The substance of that agreement created a debtor/creditor relationship." ***Id.*** at 697. Applying Minnesota law, the court declined to find an express trust because there was no requirement "to segregate the [money] or to hold [it] in trust." ***Id.*** So too here: the Agreement has no requirement to segregate RAC funds, nor a definite, unequivocal, explicit declaration of trust.

B.

RAC argues that the facts establish a resulting trust. "In Minnesota, if the intention of the payor is that the receiving party shall keep the money in a separate fund for the benefit of the payor or a third party, a trust is created." ***In re BMC Indus., Inc.***, 328 B.R. 792, 797 (Bankr. D. Minn. 2005), *citing* ***Am. Surety Co.***, 25 N.W.2d at 685-86. "A resulting trust is recognized when parties indicate an intent to establish a trust relationship but fail to reflect that intent in writing." ***Dollar Fed. Sav. Bank v. Green Tree Acceptance, Inc.***, 1991 WL 40398, at *3 (D. Minn. Mar. 21, 1991), *citing* ***Am. Surety Co.***, 25 N.W.2d at 685-86. For a resulting trust "there is always the element, although it is an implied one, of an intention to create a trust." ***Sieger v. Sieger***, 202 N.W. 742, 743 (Minn. 1925). To find a resulting trust

"circumstances must 'show with reasonable certainty or beyond a reasonable doubt that a trust was intended to be created.'" ***Bond***, 691 N.W.2d at 837.

Although WEB2B eventually made deposits to RAC's account at Intrust Bank, the funds were first processed through, and held in various accounts with, other clients' funds. RAC's agent testified that "all [he] knew and all RAC knew was that [WEB2B] would turn those funds around at some point in time and remit to RAC's bank accounts in Intrust Bank." The agent stated that RAC "had no reason to be intimately involved or knowledgeable about how they did—how they ran their business." *Cf.* ***Am. Surety Co.***, 25 N.W.2d at 685 ("If the intention is that the person receiving the money shall have the unrestricted use thereof, being liable to pay a similar amount whether with or without interest to the payor . . . a debt is created."). RAC's ignorance whether its funds were processed through a non-commingled account does not establish the intent needed to imply a trust relationship between the parties. *Cf.* ***Bond***, 691 N.W.2d at 837-38 ("The [Social Security Administration] has not manifested any intent to create a trust with individual taxpayers. The purpose of Social Security was not to create trusts . . . but was to provide social insurance . . . ."). The district court did not err in concluding that the undisputed facts here do not show with reasonable certainty or beyond a reasonable doubt that a resulting trust exists.

C.

RAC requests the imposition of a constructive trust on the $801,378.76 of the funds that North American Bank transferred to the Trustee.

A constructive trust is an equitable remedy "intended to prevent the unjust enrichment of a person holding property under a duty to convey it or use it for a specific purpose." ***Koberg v. Jones***, 157 N.W.2d 47, 52 (Minn. 1968). "[W]henever the legal title to property is obtained through fraud, oppression, duress, undue influence, force, crime, or similar means, or by taking improper advantage of a

confidential or fiduciary relationship, a constructive trust arises in favor of the person equitably entitled to the property." *Wright v. Wright*, 311 N.W.2d 484, 485 (Minn. 1981). *See also **In re MJK Clearing, Inc.***, 371 F.3d 397, 401 (8th Cir. 2004) ("To establish the right to a constructive trust under Minnesota law, Ferris must prove MJK obtained the cash collateral by fraud, by bad faith, or by other improper means."). However, "fraud, in its true sense, need not even be present" and "it is not even necessary that a fiduciary relation should exist." *Knox v. Knox*, 25 N.W.2d 225, 228 (Minn. 1946). A court "is bound by no unyielding formula, but is free to effect justice according to the equities peculiar to each transaction wherever a failure to perform a duty to convey would result in unjust enrichment." *Id.* A court must be "persuaded by clear and convincing evidence that the imposition of a constructive trust is justified to prevent unjust enrichment." *In re Estate of Eriksen*, 337 N.W.2d 671, 674 (Minn. 1983).

In bankruptcy cases, courts are reluctant to impose post-petition constructive trusts. A "constructive trust should not be imposed against the trustee in bankruptcy who represents all of the creditors" when a claimant is "situated like every other creditor and [is] not entitled to any special rights." *In re Jeter*, 73 F.3d 205, 207 (8th Cir. 1996). *See also **In re Omegas Group, Inc.***, 16 F.3d 1443, 1451 (6th Cir. 1994) (stating a constructive trust is "fundamentally at odds with the general goals of the Bankruptcy Code"); *In re Mississippi Valley Livestock, Inc.*, 745 F.3d 299, 305 (7th Cir. 2014) (imposing a constructive trust but acknowledging constructive trusts "can subvert bankruptcy's distribution scheme if courts lose sight of the fact that it is an extraordinary equitable remedy, to be used sparingly."). "When the claimant seeks to impose the constructive trust upon property of a debtor in bankruptcy, and the trust fund has been mingled with the personal property of the debtor, the claimed beneficiary to the constructive trust must sufficiently trace the trust property." *Chiu v. Wong*, 16 F.3d 306, 310 (8th Cir. 1994) (applying Minnesota law).

RAC seeks a constructive trust, asserting the funds held by the Trustee are traceable, converted property. Conversion requires a showing of the plaintiff's interest in the property and that the defendant deprived the plaintiff of it. *Lassen v. First Bank Eden Prairie*, 514 N.W.2d 831, 838 (Minn. Ct. App. 1994). However, a "plaintiff's lack of an enforceable interest in the subject property is a complete defense against conversion." *Id.* When an entity becomes the holder of a negotiable instrument, such as a check, that entity holds the property interest, defeating a claim for conversion. *See Id.* at 839 (dismissing a claim for conversion because the claimant "no longer had enforceable property rights in the checks and therefore no cognizable conversion claims when First Bank mishandled them.").

In the Agreement, RAC agreed to Check 21 "image replacement . . . pursuant to Subpart D of 12 CFR Part 229 for those original paper checks received by [RAC] from customers for deposit to [RAC's] account." Subpart D details the requirements for substitute checks. **12 C.F.R. § 229.51**. A bank receiving a substitute check "shall ensure that a substitute check . . . (1) Bears all indorsements applied by parties that previously handled the check in any form (including the original check, a substitute check . . .) for forward collection or return." **§ 229.51(b)(1)**. For ACH transactions, by the Agreement, RAC was to "obtain proper authorization(s) for electronic signals for paperless credit and debit entries performed on behalf of consumers in accordance with ACH RULES." The National Automated Clearing House Association ("NACHA") 2007 Operating Rules specify that authorizations must "be in a writing that is signed or similarly authenticated." **NACHA Operating Rules § IV, Ch. XVI.F.2** (2007).

WEB2B became the holder of the checks through a valid negotiation. *See* **Minn. Stat. § 336.3-201(b)** (explaining that an entity becomes a holder of a check through negotiation, which "requires transfer of possession of the instrument and its endorsement by the holder."). The Vice President of North American Bank testified, "Rent-A-Center endorses the check over to [WEB2B]." These endorsements allowed

-11-

WEB2B to deposit the funds into its accounts at North American Bank. A WEB2B employee testified that WEB2B—not RAC—"put [the endorsements] there" because North American Bank "wanted it." However, that RAC was required to endorse (or authorize) the check images or text files to WEB2B is not in genuine dispute. Because WEB2B was the holder of the checks, RAC no longer had enforceable property rights in the checks. *See **In re MJK Clearing, Inc.**, 286 B.R. 862, 880 (Bankr. D. Minn. 2002) (concluding no cause of action for conversion was established and that there was "no clear and convincing evidence that a constructive trust [was] necessary to prevent unjust enrichment"). The district court properly concluded that RAC had identified no clear and convincing evidence of conversion sufficient to justify imposing a constructive trust on the remaining funds.[2]

\* \* \* \* \* \* \*

The judgment is affirmed.

_____

_____

[2]This court need not reach questions of the Trustee's strong-arm powers.